AIRCRAFT & ENGINE MAINTENANCE & OVERHAUL, BUILDING, CONSTRUCTION, MANUFACTURING, PROCESSING AND DISTRIBUTION and Allied Industries Employees, Local 290, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Appellant,

v.

I. E. SCHILLING CO., Inc., Appellee.

No. 20920.

United States Court of Appeals
Fifth Circuit.

Jan. 12, 1965.

Charles J. Morris, Dallas, Tex., Seymour A. Gopman, Miami Beach, Fla., Joseph H. Kaplan, Miami, Fla., Mullinax, Wells, Morris & Mauzy, Dallas, Tex., for appellant.

John Bacheller, Jr., Atlanta, Ga., Park H. Campbell, Miami, Fla., Ray C. Muller, Atlanta, Ga., Hudson, McNutt, Campbell & Isom, Miami, Fla., and Fisher & Phillips, Atlanta, Ga., for appellee.

Before JONES and BELL, Circuit Judges, and HUNTER, District Judge.

HUNTER, District Judge:

Section 303 of the Labor Management Relations Act, 29 U.S.C.A. § 187, gives the employer a cause of action for damages against a union that engages in a secondary boycott in violation of Section 8(b) (4) (B) of the National Labor Relations Act.[1] Schilling, a ready mix ce-ment company, brought this action in the district court under that provision after the Teamsters Local had picketed its trucks at a neutral construction site where the cement was being poured. A jury verdict was returned in favor of Schilling in the sum of $10,411. Judgment was entered on the verdict.

The question here, in simple terms, is: Was the conduct of the union and the picketing which took place at the gate to the job site done with the object of forcing or requiring Jones to cease doing business with Schilling? In answer to a specific interrogatory the jury said "yes". The jury answered another interrogatory holding that the picketing had no other object. The broad question presented by this appeal is whether the evidence was sufficient to present a factual question for the jury. Appellant contends that its picketing activities were, as a matter of law, legal and not proscribed. The dividing line between forbidden secondary activity and protected primary activity has been the subject of intense litigation both before and after the 1959 amendments to 8(b) (4), which broadened the coverage but also added the express exception that "nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." We need not detail the course of this sometimes complex litigation. It suffices to say that the object of picketing is not something which can always be evaluated mechanically. The very nature of the problem as illustrated by the jurisprudence re-

1. Section 8(b) (4) of the Labor Management Relations Act, as amended, makes it an unfair labor practice for a union or its agents:

"(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * * Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing. * * *." 29 U.S.C.A. § 158(b) (4) (B).

veals that for the facts of this case there is no definitive rigid formula which can be accepted as conclusive. (Local 761, Intern. Union Elec. Radio and Mach. Workers of America AFL-CIO v. N. L. R. B., 366 U.S. 667, 81 S.Ct. 1285, 6 L. Ed.2d 592; Brown Transport Corp. v. NLRB, 5 Cir., 1964, 334 F.2d 334 F.2d 30; Superior Derrick Corp. v. NLRB, 5 Cir., 1960, 273 F.2d 891).

■ Having in mind that on appeal the evidence and all inferences therefrom must be viewed in the light most favorable to the prevailing party and in support of the jury verdict, the facts may be set forth as follows:

1. On October 3, 1961, J. A. Jones Construction Company commenced work on a project in Miami, Florida, known as the Eastern Air Lines major jet overhaul facility. Jones employed subcontractors to perform portions of the work. Total employment on the job approximated 600 men. All these personnel belonged to labor organizations and the job was considered to be "100% union", except for appellee.

2. As subcontractors for ready-mixed concrete, Jones chose two suppliers— Maule Industries, which had a collective bargaining contract with the appellant Teamsters Union; and Schilling, who had no contract with any union and was considered non-union. Both of these companies commenced servicing the job in the latter part of October, 1961.

3. As the deliveries continued, J. A. Jones became dissatisfied with the service of Maule Industries, but was well pleased with the service furnished by Schilling. Jones cancelled Maule Industries' contract.

4. Schilling was advised that henceforth, it would supply the entire job requirements of ready mixed concrete. Thereafter, Schilling made only six deliveries before trouble developed.

5. On May 16, 1962, at about 7:55 A.M., two pickets appeared at the job site. One was the president of the Union. The other had been employed for the sole purpose of picketing. The picketing commenced as Schilling's truck entered the job site. The sign carried stated: "Truck Drivers of I. E. Schilling Company, come and join us. Teamsters' Local 290."

6. While on the job site, Schilling's truck drivers and trucks were not visible to the pickets and the effect of the picket sign on Schilling's drivers was limited to the time it took the driver to go through the gate.

7. On this first morning of picketing, Appellee's president, Schilling, had driven from his plant, less than a mile away, directly to the J. A. Jones job. The Schilling plant at that specific time was not being picketed. This plant was Schilling's primary place of business and picketing could readily be carried on there and was, periodically.

8. Schilling watched his first truck arrive and saw the two pickets emerge from cars. As the picketing continued, all "crafts" left the job, in number between 500–600 men.

9. Jones delayed further pours until approximately one week later, May 22, 1962. On that date Schilling arrived at the J. A. Jones job site 15–30 minutes before his truck was scheduled to arrive. At the job site, he noted a picket already waiting; the picket was sitting in an automobile. When the truck entered the job site, the picket emerged and commenced picketing. Again, there was a general work stoppage, with 500–600 men leaving the job.

10. The next morning, a group of job stewards, representing a number of building trades unions whose members were employed on the job, met with the J. A. Jones, project manager.[2] They stated that "the men would not work on the job while J. A. Jones was pouring concrete with those trucks, and they wanted assurance * * * (that J. A. Jones) * * * would stop pouring

2. Appellant Teamsters was a member of the Building Trades Council.

with those trucks.[3] The project manager, knowing that the only method of getting his job going again was to remove appellee Schilling, sought another supplier, Acme Concrete, after assuring himself that Acme used Appellant Teamsters drivers.

11. During the period between the first picketing at J. A. Jones—May 16—and the second picketing—May 22—appellant picketed other jobs being serviced by Schilling. However, this picketing was conducted in quite a different manner. Thus, an appellant picket would appear on a job, picket for a time, but when he found that no secondary employees walked off, he would leave. Similarly, when a job had once been picketed and no walkout by secondary employees occurred, that job would not be revisited by the picket.

12. The purpose of picketing at the plant and jobs of Appellee (according to Appellant) was " * * * in the hopes that it (would) embarrass the employer to the extent that he (would) file a charge and a petition for an election * * *."

A review of the record, and especially the facts heretofore recited, discloses that the proof was sufficient to create issues for the jury. These issues were submitted on a clear and correct charge. This Court's function as to a resolution of those issues was exhausted when, as here, an evidentiary basis was apparent.

Appellant vigorously argues that "the N. L. R. B. dismissal of the 8(b)(4) charges is res judicata and/or collateral estoppel to this action under Section 303(a)." Here, there was no adjudication by the Board. Schilling filed a charge. The general counsel declined to issue a complaint. Surely, the mere refusal by the general counsel to issue

a complaint is not res judicata and can not constitute a collateral estoppel. The failure of the general counsel to issue a complaint is not necessarily based on the evidence or the merits of a case. (Dunn v. Retail Clerk's International Association, 307 F.2d 285, 6 Cir., 1962). To dismiss a damage suit on the proposition that the general counsel had refused to proceed would be to deny to the employer his day in court in clear contradiction to the requirements of Section 303 of the Act.

The trial court submitted a special interrogatory and thus determined that the jury included $3,846.00 as attorney's fees in its damage award. We agree with appellant that there was no proof to support this award. This is true because the record clearly reveals that the sum total of attorney's fees was $1,684.27. This amount would have been recoverable. (Local Union 984, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL–CIO v. Humko, 287 F.2d 231, 6 Cir., 1961). Although the record reveals a fair and impartial attitude by the presiding judge, in denying the motion for a new trial there was a failure on his part to recognize the disparity between the proof and the jury's award on the question of attorney's fees, which technically constituted an abuse of discretion amounting to an error of law. However, we are of the opinion that justice will better be served if, instead of now remanding the cause for a new trial, we give appellee, in lieu of such remand, the opportunity of remitting the amount of $2,161.73.[4]

The judgment will stand remanded for a new trial, unless appellee files a remittitur within thirty days in this court for $2,161.73, in which event the judgment will stand affirmed (28 U.S.C.A.

---

3. This meeting, and certain other evidence, was the basis for inclusion of bricklayers, ironworkers, laborers and pipefitters in the complaint. The District Court directed the verdict for the bricklayers and the jury found in favor of the remaining three building trades unions.

4. This is the difference between the $3,-846 awarded by the jury and the $1,684.-27 which is in conformity with the evidence.

§ 2106;[5] Texas Company v. Christian, 5 Cir., 1949, 177 F.2d 759; United States v. Certain Parcels of Land, 5 Cir., 1945, 149 F.2d 81; Boyle v. Bond, 88 U.S. App.D.C. 178, 187 F.2d 362, Circuit Court of Appeals, District of Columbia; Boucher v. Krause, 7 Cir., 1953, 200 F. 2d 576, cert. denied 345 U.S. 997, 73 S.Ct. 1141, 97 L.Ed. 1404.)

5. Title 28 U.S.C.A. § 2106 provides that an appellate court "may affirm, modify, vacate, set aside or reverse" any judgment "brought before it for review" and "may remand the cause and direct entry of such appropriate judgment * * * or require such further proceedings to be had as may be" justified.