**EDNA H. PAGEL, INC., a California corporation doing business as Sweetener Products Company, and Vernon Warehouse, Inc., a California corporation, Petitioners-Counter-Defendants-Appellants,**

v.

**TEAMSTERS LOCAL UNION 595, Chartered By the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Respondent,**

and

**Teamsters Local Union 848, Chartered By the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Respondent-Counter-Appellant-Appellee.**

No. 80–5252.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1981.

Decided Feb. 2, 1982.

Glenn to three concurrent six-year terms, two of which exceeded the maximums permissible under *Amidon*.

Richard R. Irvin, McLean & Irvin, Woodland Hills, Cal., for petitioners-counter-defendants-appellants.

Robert D. Vogel, Pappy, Kaplon & Vogel, Los Angeles, Cal., for Local No. 848.

Michael Shelley, Richmon & Garrett, Los Angeles, Cal., argued, for Local No. 595; James M. H. Ball, Potts & Richman, Los Angeles, Cal., on brief.

Before KENNEDY and REINHARDT, Circuit Judges, and CRAIG,* District Judge.

* Honorable Walter Early Craig, Senior United States District Judge for the District of Arizona, sitting by designation.

REINHARDT, Circuit Judge.

Appellants Edna H. Pagel, Inc., dba Sweetener Products Co., and Vernon Warehouse, Inc., (collectively referred to as "Pagel") appeal the district court's order denying Pagel's motion to vacate the arbitrator's award and granting both appellee Teamster Local Union 848's motion to confirm the arbitrator's award and Local 848's motion to compel arbitration of Pagel's back pay liability. We affirm.[1]

## FACTS

Pagel is a signatory to two collective bargaining agreements, the Institutional Grocery Wholesale Delivery Agreement with Local 848 and the Institutional Grocery Warehouse Agreement with Local 595. The agreements contain a provision that allow Pagel's employees to respect authorized Teamster picket lines.[2] Pagel employed 20 drivers, most of whom belonged to Local 848, and 18 warehousemen, most of whom belonged to Local 595, as well as four maintenance men. On November 15, 1978, National Labor Relations Board (NLRB) certified Local 595 as the collective bargaining representative for a new bargaining unit comprised of the four maintenance men. Subsequent negotiations resulted in an impasse, and the maintenance men voted to strike and erected picket lines[3] at midnight on Monday, February 5, 1979. On February 5, Pagel's drivers and warehousemen individually chose to respect, and refused to cross, the picket line established by their co-workers, the maintenance men.[4]

Pagel maintained its operations with supervisory personnel until February 7, 1979, and then posted signs and ran newspaper ads which stated that strike conditions existed and offered employment to drivers, warehousemen and maintenance men for permanent positions. Subsequently, Pagel hired persons to perform the work of the striking maintenance men as well as the drivers and warehousemen, all of whom continued to honor the picket line.

On Friday, May 4, 1979, at 10:00 P.M., the maintenance men ceased all picketing and the employees who had honored the picket line unconditionally requested reinstatement to their positions. On Monday, May 7, 1979, the drivers and warehousemen reported for work at their regular starting time, but Pagel informed them that they would be reinstated to their previous positions according to seniority and job qualification only when and if their replacements vacated the jobs.

Believing Pagel had violated the collective bargaining agreement by failing to immediately rehire its members, Local 848 sought arbitration pursuant to the agreement's terms. Independently, Local 595 filed an unfair labor practices charge against Pagel with the NLRB; Local 595 charged Pagel with a violation of sections 8(a)(3) and 8(a)(5) of the Labor Management Relations Act, 29 U.S.C. § 158(a)(3) and (5) (1976), for discriminatory treatment of employees for exercising their contractual right to honor a picket line. Both the Regional Director and the General Counsel,

1. Teamster Local Union 595 was also a party to the arbitration and a respondent below. The district court's order neither denied nor granted Local 595's motion to confirm the arbitrator's award or motion to compel arbitration of Pagel's back pay liability. However, Pagel's motion to vacate the arbitrator's award included Local 595, and when the district court denied Pagel's motion, it effectively enforced Local 595's rights under the award despite the failure to grant Local 595's motion to confirm. Thus, for the purposes of this appeal, we see no basis for reaching any different result as to Local 595.

2. The relevant language in both agreements is identical:

Article X—Picketing and Boycotting
A. It shall not be a violation of this Agreement, or cause for discharge for any employee to refuse to cross a legitimate and bona-fide picket line. A legitimate and bona-fide picket line shall be defined, for the purpose of the Agreement, as a picket line that is sanctioned and/or authorized by the Joint Council of Teamsters No. 42.

3. The Joint Council of Teamsters No. 42 sanctioned and authorized the maintenance men's picket lines.

4. The drivers and warehousemen at no time struck or picketed themselves.

on appeal, refused to issue a complaint. Local 595 then joined Local 848's arbitration proceeding. The arbitrator heard the matter and rendered an opinion holding that both collective bargaining agreements precluded Pagel from hiring permanent replacements. The arbitrator awarded the employees reinstatement with back pay.

Pagel brought a petition to vacate the award in state court. Under California law, a response to a petition is due ten days after filing of the petition. On the eleventh day, the unions removed the case to district court and thereafter filed responses to the petition. The district court denied the motion to vacate and granted Local 848's motion to confirm the arbitration award and its motion to compel arbitration of Pagel's back pay liability.

## ANALYSIS

In affirming the district court's order, we discuss three issues raised on appeal. First, Pagel argues that the unions' failure to respond timely to the petition to vacate in state court bars the unions from denying the allegations in the petition and mandates an order in favor of Pagel. Second, Pagel urges that the arbitrator exceeded his authority by effectively rewriting the terms of the collective bargaining agreement in making his award. Finally, Pagel claims that the NLRB's refusal to issue a complaint in the matter bars the arbitrator from granting relief to the unions.

### I.

▉▉▉ A federal court must take a case as it finds it on removal, *Duncan v. Gegan*, 101 U.S. 810, 25 L.Ed. 875 (1880), and if a state court has entered a final default judgment prior to removal, the defaulting party is not entitled to relief from the judgment as a matter of law. *Butner v. Neustadter*, 324 F.2d 783 (9th Cir. 1963). Rather, if the defaulting party desires relief, it must move to set aside the default pursuant to Federal Rule of Civil Procedure 60(b). In the present case, Pagel never obtained a default judgment in state court, and therefore, the

district court found no barrier to its considering the unions' response and motion to confirm the arbitration. If the district court had required the unions to seek relief from default through Rule 60(b) when the state court had never entered a default judgment, the court would have improperly altered the status of the proceeding which existed at the time of removal. *See Butner*, 324 F.2d at 785; *Talley v. American Bakeries Co.*, 15 F.R.D. 391, 392 (E.D.Tenn. 1954). Nor does the fact that the union's response to the petition was filed in federal court after the time for filing a response under state law[5] compel the district court to deem the allegations in Pagel's petition admitted and to award judgment for Pagel. We do not read the state law as barring a state court judge from permitting a late response to a petition. Therefore, the district court judge did not act improperly in allowing the unions to respond after the tenth day following the filing of the petition.

### II.

Pagel claims that the arbitrator altered the collective bargaining agreements by deeming the permanent replacement of employees to be a discharge in violation of the agreement. Pagel argues that the relevant law allows permanent replacement notwithstanding a contract provision prohibiting discharge and that the collective bargaining agreement did not expressly waive Pagel's right to hire permanent replacements.

▉▉▉ Although there may be some question whether the arbitrator interpreted the collective bargaining agreement correctly, we cannot reinterpret the agreement merely because we might disagree with his analysis. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). Courts must defer to the arbitrator's award if on its face

---

5. Cal.Civ.Proc.Code §§ 1290, 1290.6 (Deering 1981).

the award "represents a plausible interpretation of the contract in the context of the parties' conduct," *Holly Sugar Corp. v. Distillery, Rectifying, Wine & Allied Workers International Union, Local 28*, 412 F.2d 899, 903 (9th Cir. 1969); *Francesco's B., Inc. v. Hotel & Restaurant Employees & Bartenders Union, Local 28*, 659 F.2d 1383 (9th Cir. 1981), or, in other words, if the arbitrator's decision "draws its essence" from the collective bargaining agreement, *In re Aloha Motors, Inc. and ILWU Local # 142*, 530 F.2d 848, 849 (9th Cir. 1976) (quoting *San Francisco-Oakland Newspaper Guild v. Tribune Publishing Co.*, 407 F.2d 1327 (9th Cir. 1969)).

In the present case, the collective bargaining agreement contained a clause prohibiting the discharge of employees for picketing or honoring picket lines.[6] The arbitrator interpreted the prohibition against discharge to preclude permanent replacement of employees who exercised this contractually-protected right. Permanent replacement is a drastic economic action which in many respects is similar in its effect to discharge. Certainly, an interpretation, which prohibits permanent replacement, "draws its essence" from the contractual bar against discharge, and whether or not we agree with this interpretation, we cannot say that it is implausible or that it modified the contract.

## III.

Prior to arbitration, Local 595 filed an unfair labor practices charge with the NLRB, but both the Regional Director and the General Counsel, on appeal, refused to issue a complaint. The charge addressed the propriety of essentially the same conduct as was challenged in arbitration,[7] and Pagel claims that the NLRB's refusal to issue a complaint bars any decision by the arbitrator in favor of the unions.

If the NLRB had issued a complaint and a decision had been rendered in favor of Pagel, the decision might have precluded a subsequent arbitration over the same issue. *Paramount Transportation System v. Chauffeurs, Teamsters & Helpers, Local 150*, 436 F.2d 1064 (9th Cir. 1971). In the case before us, the NLRB made a final and unreviewable decision [8] that no complaint should be issued, but in its decision-making process, the NLRB did not resolve the merits of the unions' grievances in an adversary or trial context.[9] We hold that in cases involving issues of fact or

---

6. *See* note 2 *supra.*

7. In its entirety, the charge stated:

> Within the six (6) months last past [Pagel] discriminated with regard to tenure, term and condition of employment to discourage membership in charging party.
>
> Warehouse employees honored a picket line set up by a unit of maintenance employees of Employer. Notice was given to the Employer that the picket was ending and that the warehouse employees were reporting back to be reinstated. Employer refused to reinstate all of said employees, stating as its reason that they were permanently replaced. Any of said warehouse employees reinstated were so reinstated out of seniority. Said action by Employer was in derogation of the Collective Bargaining Agreement covering these employees and protecting [them] from discriminatory treatment for exercising their contractual right to honor a picket line.

8. *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967); *Henderson v. International Longshoremen's & Warehousemen's Union Local 50*, 457 F.2d 572, 578 (9th Cir.), cert. denied, 409 U.S. 852, 93 S.Ct. 65, 34 L.Ed.2d 95 (1972).

9. In its letter informing Local 595 that no unfair labor practices complaint would be issued, the NLRB General Counsel also stated: "Moreover, it was noted that the collective bargaining agreement did not specifically accord those who choose to honor picket lines reinstatement rights in excess of those to which they would be entitled to under current board law." Pagel characterizes this language as the NLRB's interpretation of the contract on the permanent replacement issue. However, the General Counsel merely observed that the contract did not "specifically" extend reinstatement rights; the General Counsel did not purport to conclude whether such extension of reinstatement rights could be inferred from the contract in the context of all relevant circumstances. Thus, we are skeptical whether the General Counsel's refusal in this case could foreclose arbitration even if we did not conclude that refusals in general do not constitute res judicata or collateral estoppel.

contract interpretation the NLRB's refusal to issue a complaint does not act as res judicata or bar a party from seeking arbitration under the collective bargaining agreement and that no collateral estoppel effect attaches to such refusal.[10]

Although neither party cited *Paramount,* we believe that it controls the disposition of the res judicata or collateral estoppel issue.[11] In *Paramount,* we held that the NLRB's resolution of material factual issues after a full hearing constituted collateral estoppel to later litigation of those issues in district court. In reaching this holding, we said, however:

> [W]e conclude that collateral estoppel effect should be given only to those administrative determinations that have been made in a proceeding fully complying with the standards of procedural and substantive due process that attend a valid judgment by a court and further, that such effect should be accorded only to those findings upon material issues that are supported by substantial evidence on the administrative record as a whole.

436 F.2d at 1066. The NLRB's refusal to issue a complaint ends the administrative process before any adversarial process or full hearing on the merits. To hold that an NLRB refusal to issue a complaint could be given res judicata or collateral estoppel effect would be contrary to the principle we enunciated in *Paramount.* Thus, the refusal cannot prohibit the unions from obtaining relief from the dispute resolution system for which they bargained—arbitration.

The reasoning in decisions from other jurisdictions on similar issues is in accord with this conclusion. Other courts have held that the NLRB's refusal to issue a complaint is not a final decision on the merits of the underlying issue and thus may not be given res judicata or collateral estoppel effect when a subsequent claim for relief is made in the courts under the Labor Management Relations Act [12] or the Labor Management Reporting and Disclosure Act.[13] Since the NLRB's refusal to issue a complaint lacks sufficient finality to bar subsequent relief in the courts, that same lack of finality logically precludes any res judicata or collateral estoppel effect on subsequent arbitration proceedings.

**10.** In a rare case, the NLRB might decide a pure question of Board law which involved no factual issues or contract interpretation issues through a non-evidentiary administrative determination (*e.g.,* a refusal to issue a complaint) and, at the same time, the collective bargaining agreement might explicitly empower the arbitrator to resolve that same pure question of Board law. We need not decide here whether a prior NLRB determination of the pure question of law in such a case could serve as a bar to a subsequent arbitration limited to that same legal question.

**11.** In *Hospital & Institutional Workers Union Local 250 v. Marshal Hale Memorial Hosp.,* 647 F.2d 38 (9th Cir. 1981), we held that the refusal of the NLRB to issue a complaint did not bar arbitration because "there is no logical inconsistency between the Regional Director's finding that the Hospital's conduct was privileged under the labor laws and a possible arbitrator's decision that that conduct violated the collective bargaining agreement." *Id.* at 41. We did not consider in *Marshal Hale* whether the Board's failure to issue a complaint meets the requirements for res judicata or collateral estoppel regardless of any conflict in the resolution of issues under labor law and the agreement.

**12.** *Thomas v. Consolidated Coal Co.,* 380 F.2d 69, 77–78 & n.12 (4th Cir.), *cert. denied,* 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599 (1967) (§ 301(a), 29 U.S.C. § 185(a)); *Smith v. Local No. 25, Sheet Metal Workers Int'l Ass'n,* 500 F.2d 741, 748 n.4 (5th Cir. 1974) (§ 301(a), 29 U.S.C. § 185(a)); *Peltzman v. Central Gulf Lines, Inc.,* 497 F.2d 332, 334 (2d Cir. 1974), *aff'd after remand,* 523 F.2d 96 (2d Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976) (§ 301(a), 29 U.S.C. § 185(a)); *Aircraft & Engine Maintenance & Overhaul, Constr., Mfg., Processing & Distrib. v. I. E. Schilling Co.,* 340 F.2d 286, 289 (5th Cir. 1965), *cert. denied,* 382 U.S. 972, 86 S.Ct. 528, 15 L.Ed.2d 464 (1966) (§ 303, 29 U.S.C. § 187). *See also Ruzicka v. General Motors Corp.,* 336 F.Supp. 824, 827 (E.D.Mich.1972); *Local Union No. 59 of Sheet Metal Int'l Ass'n v. J. E. Workman, Inc.,* 343 F.Supp. 480, 483–85 (D.Del. 1972); *Local Union No. 4, Int'l Bhd. of Elec. Workers v. Radio Thirteen-Eighty, Inc.,* 334 F.Supp. 242, 249 (E.D.Mo.1971), *modified on other grounds,* 469 F.2d 610 (8th Cir. 1972).

**13.** *Boggs v. International Bhd. of Elec. Workers,* 326 F.Supp. 1, 3–4 (D.Mont.1971) (§ 102, 29 U.S.C. § 412).

Further, in a situation similar to the one before us, the Second Circuit compelled an employer to arbitrate a grievance despite a previous refusal by the NLRB to issue an unfair practices complaint. *International Union of Electrical, Radio & Machine Workers v. General Electric Co.*, 407 F.2d 253, 264 (2d Cir. 1968), *cert. denied*, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969). If, as we do, we accept the Second Circuit's conclusion that a court may compel arbitration notwithstanding the NLRB's refusal to issue a complaint, then *a fortiori* the refusal cannot bar enforcement of the arbitrator's decision on the merits.

AFFIRMED.