**MILLER BREWING COMPANY,**
**Plaintiff-Appellant,**

v.

**BREWERY WORKERS LOCAL UNION NO. 9, AFL–CIO, Defendant-Appellee.**

No. 83–2048.

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1984.

Decided June 25, 1984.

Rehearing and Rehearing En Banc Denied Aug. 23, 1984.

George K. Whyte, Jr., Quarles & Brady, Milwaukee, Wis., for plaintiff-appellant.

James P. Maloney, Zubrensky, Padden, Graf & Maloney, Milwaukee, Wis., for defendant-appellee.

Before POSNER and FLAUM, Circuit Judges, and NICHOLS, Senior Circuit Judge.[*]

POSNER, Circuit Judge.

Miller Brewing Company sued Local 9 of the Brewery Workers Union under section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, to set aside an arbitrator's award to the union. The award was based on the union's complaint that Miller had violated a collective bargaining agreement with it. The union filed a counterclaim to Miller's suit. The counterclaim, which was based both on section 301 and on section 9 of the United States Arbitration Act of 1925, 9 U.S.C. § 9, sought enforcement of the arbitration award. On the union's motion for summary judgment, the district court entered an order enforcing the award. 562 F.Supp. 1368. It also ordered Miller to pay the union a reasonable attorney's fee, on the ground that Miller's challenge to the arbitration award had been frivolous. Miller appeals both orders.

For many years all the brewers in Milwaukee had bargained with Local 9 in a multi-employer bargaining unit, but by 1979 the unit had only three members— Miller, Schlitz, and Pabst. The successive collective bargaining agreements between the union and the brewers' association contained a union-shop clause requiring every new employee to join the union within 30 days after beginning work and a hiring-preference clause entitling regular employees laid off by any of the brewers to "preference" (not defined) in hiring by any other brewery in the unit. The preference was both over new applicants for employment with the brewery and over any of the brewery's laid-off temporary employees who might be seeking to be recalled or rehired.

Early in 1981 Schlitz announced that it was withdrawing from the multi-employer unit and would negotiate separately with Local 9. The union's president told the two remaining members of the unit, Miller and Pabst, that Schlitz had agreed to include in the separate collective bargaining agreement that it was negotiating with the union the same hiring-preference clause that the multi-employer agreement contained, and Miller and Pabst agreed to a modification of that agreement that would preserve to Schlitz's employees the rights they had had when Schlitz had been a party to it. But

[*] Hon. Philip Nichols, Jr., of the Federal Circuit, sitting by designation.

matters did not develop as anticipated. The bargaining between the union and Schlitz broke down. The union called a strike, Schlitz closed its Milwaukee brewery permanently, and Schlitz and the union then entered into a shutdown agreement that provided for the "permanent layoff and termination of seniority and employment relationship from the Company of all employees" in the Milwaukee brewery. About 200 workers were affected.

Several months later Miller recalled 39 temporary employees who had been laid off. This recall precipitated the filing of a grievance against Miller by one of the terminated Schlitz workers, Gene Pearson, who claimed that Miller was required by the hiring-preference clause in the multi-employer collective bargaining agreement to give him preference over Miller's own temporary workers. As required by the agreement, the grievance was referred to an arbitrator after it could not be settled informally. He interpreted the reference in the clause to "regular employees laid off from ... those Employers signatory to the 1979–81 agreement" to include those employees of Schlitz who had been "permanently laid off" as a result of the shutdown agreement with the union. He therefore concluded that Miller had violated the collective bargaining agreement in failing to give Pearson preference. He ordered Miller "to hire Gene Pearson ... and any other employees similarly situated who had applications on file at the Company and who were not given hiring preference over temporary Miller employees ...."

■ The union sought enforcement of the arbitrator's award under both the Arbitration Act, which has its own standards for the validity of arbitration awards, see 9 U.S.C. § 11, and section 301 of the Taft-Hartley Act, which is the source of federal common law principles governing the validity of labor arbitration awards. But the parties quite properly make no separate point about the Arbitration Act's standards. We may assume that a multi-employer collective bargaining agreement with Milwaukee brewery workers suffi-

ciently involves interstate commerce to come within the reach of 9 U.S.C. § 2, which we construed broadly just the other day in *Snyder v. Smith*, 736 F.2d 409, 417–18 (7th Cir.1984). And the Act's exclusion of "contracts of employment of ... workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, is inapplicable; it has been held to be limited to workers employed in the transportation industries. See *Pietro Scalzitti Co. v. International Union of Operating Engineers*, 351 F.2d 576, 579–80 (7th Cir.1965); *Signal-Stat Corp. v. Local 475, United Electrical, Radio & Machine Workers of America*, 235 F.2d 298, 301–03 (2d Cir.1956); *Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers of America, (U.E.) Local 437*, 207 F.2d 450 (3d Cir.1953) (en banc). But section 301 was enacted long after the Arbitration Act and deals specifically, as the Arbitration Act does not, with labor contracts; it therefore supersedes, within its domain, the standards of the earlier act. *Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310, 312 n. 3 (7th Cir. 1981).

■ Miller's first ground for attacking the arbitrator's award is that it does not "draw its essence" from the collective bargaining agreement. This somewhat curious, but canonical, see, e.g., *W.R. Grace & Co. v. Local Union 759, Int'l Union of Rubber Workers*, 461 U.S. 757, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983), wording derives from the statement in *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), that an arbitrator's award under a collective bargaining agreement "is legitimate only so long as it draws its essence from the collective bargaining agreement." The surrounding language makes clear that what is meant is that the award is valid provided it is an attempt to interpret the collective bargaining agreement rather than to apply the arbitrator's own ideas of right and wrong: "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not

sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." (For a recent application of this standard by this court see *Young Radiator Co. v. U.A.W. Local Union No. 37*, 734 F.2d 321 (7th Cir.1984).) The liability as distinct from remedial aspect of the award in this case—that is, the finding that Miller improperly failed to give preferential consideration to the former employees of Schlitz's Milwaukee brewery—passes this not very demanding test. The arbitrator purported to be interpreting the language of the collective bargaining agreement in finding that the clause had been violated. His interpretation may very well have been incorrect, but that is none of our business. Our function is complete when we are satisfied that the arbitrator was not dispensing qadi justice but was construing the collective bargaining agreement. He was doing that when he held that the Schlitz employees had been "laid off" within the meaning of the collective bargaining agreement, if not within the usual meaning of the term which connotes a temporary rather than permanent cessation of employment.

But we do not think that the remedy he meted out for the violation was based on an interpretation of the collective bargaining agreement, as distinct from the arbitrator's private notions of equity. The agreement provides that laid-off employees of signatory employers are entitled to "preference" over recalled temporaries. The term is not defined in the collective bargaining agreement but Miller's counsel told us at argument (without demur from the union's counsel) that it meant that if a preferred employee and a temporary employee were competing for a job opening the preferred employee would get the job if—but only if—he had a satisfactory work record. Nevertheless the arbitrator did not merely order Miller to give preferential considera-

tion to the laid-off Schlitz employees, or (what would have been the same thing) to hire 39 of those employees if their work records were satisfactory; he ordered Miller to hire Pearson and 38 other former Schlitz employees who had applied for the jobs, period. We might have assumed that it was implicit in this order that the former Schlitz employees have satisfactory work records and thus be entitled to a hiring preference under the agreement, were it not for the fact that the arbitrator ordered Pearson hired unconditionally even though there was no evidence that his work record was satisfactory. We can find nothing in the collective bargaining agreement that gives a hiring preference to a worker who has an unsatisfactory work record; nor can the union; most important, nor could the arbitrator.

Therefore, this part of the award cannot have been based on the hiring-preference clause itself. If it has any basis in the collective bargaining agreement it must be in the agreement's implicit or explicit authorization to the arbitrator to devise remedies for violations of the agreement. Collective bargaining agreements often say little or nothing about the arbitrator's remedial powers; yet it cannot be that he has none; and since he derives all his powers from the agreement, the agreement must implicitly grant him remedial powers when there is no explicit grant. See Hill & Sinicropi, Remedies in Arbitration 20–26 (1981); Feller, *The Remedy Power in Grievance Arbitration*, 5 Indus.Rel.L.J. 128 (1982). This clearly is the Supreme Court's view. The passage we quoted earlier from the *Enterprise Wheel* opinion about the arbitrator's being confined to interpreting the agreement is immediately preceded by the observation that "The draftsmen [of the collective bargaining agreement] may never have thought of what specific remedy should be awarded to meet a particular contingency," 363 U.S. at 597, 80 S.Ct. at 1361, and the Court went on to uphold the arbitrator's remedy—an award of back pay after the expiration of the collective bargaining agreement—even though the reme-

dy had not been mentioned in the agreement. There are many similar court of appeals decisions; in this circuit alone see, e.g., *International Union of Operating Engineers, Local No. 139 v. Carl A. Morse, Inc.*, 529 F.2d 574, 580 (7th Cir. 1976); *United Electrical Radio & Machine Workers of America v. Honeywell Inc.*, 522 F.2d 1221, 1226–27 (7th Cir.1975); *Mogge v. District 8, Int'l Ass'n of Machinists*, 454 F.2d 510, 514–15 (7th Cir.1971).

Here all the collective bargaining agreement said about the arbitrator's remedial powers was that, "Should the arbitration award order reinstatement, the employee shall receive pay in accordance with the findings of the impartial arbitrator." This makes it clear that the arbitrator has the power to order reinstatement of an improperly laid off or fired employee, and seems to make an award of back pay in the amount calculated by the arbitrator automatic in such a case. But the arbitrator did not order reinstatement. Pearson and the others had never been employed by Miller and therefore could not be "reinstated" by it. The arbitrator ordered Miller to hire former employees of other brewers. Any authority to do this was implicit rather than explicit.

Although there is unavoidable tension between saying on the one hand that the arbitrator may not go outside the agreement and on the other hand that he may exercise remedial powers not expressly granted in the agreement, it is not always hard to tell whether an arbitrator when he formulates a particular remedy is interpreting his implied remedial authority or implementing some personal notion of justice. In this case, for example, the hiring-preference clause implies that the arbitrator can order the company to give preference to one worker over another if the clause requires such preference, even though the remedies section in the collective bargaining agreement speaks only of reinstatement. We can go further and say with some confidence that the agreement implicitly authorizes the arbitrator to order Miller to hire a worker who by virtue of a hiring preference is entitled to be hired to fill a vacancy. But we have no textual guide to the question whether in ordering the hiring of the 39 laid-off Schlitz workers without ascertaining whether they were qualified and therefore entitled to be hired, the arbitrator was exercising remedial powers implicitly conferred on him by the agreement or simply devising what he thought, without reference to the agreement or anything fairly implied in it, would be an equitable remedy.

In these circumstances we must consider whether it is at all plausible to suppose that the remedy he devised was within the contemplation of the parties and hence implicitly authorized by the agreement. Only if we think it clearly was not may we reverse. *Bacardi Corp. v. Congreso de Uniones Industriales*, 692 F.2d 210, 214 (1st Cir.1982). But that is what we think. It is almost unimaginable that if the question had come up in the collective bargaining negotiations Miller and Pabst would have agreed that the arbitrator could force Miller or Pabst, as a remedy for breach of the preference clause (the breach here consisting of failing to consider whether the former Schlitz employees had satisfactory work records and should therefore have been offered jobs ahead of the Miller temporaries), to hire workers who might be unqualified because they had unsatisfactory work records. This would go beyond making the victims of the breach of the preference clause whole, and would give unqualified workers windfall gains; and by reducing the efficiency of Miller's operations it might impose greater costs on Miller than the benefits it conferred on those victims. It would be a punitive sanction. Now arbitrators are rarely thought authorized to award punitive damages. It is not the kind of remedy that the parties probably would have agreed to authorize if they had thought about the matter, because of the great power it would give the arbitrator (subject to virtually no judicial review), and the bitter note a claim for punitive damages could inject into the parties' relationship, which is a continuing one. See Hill & Sinicropi, *supra*, at 184–85; cf.

*Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 825 (7th Cir.1984). But in effect this arbitrator imposed a punitive sanction.

We need not decide whether we agree with everything in the Eighth Circuit's recent (and sharply divided) en banc decision in *United Electrical, Radio & Machine Workers of America v. Litton Microwave Cooking Products,* 728 F.2d 970, 972 (8th Cir.1984). The company in that case forced workers to take paid vacations at inconvenient times, and the arbitrator held that in doing so the company had violated the collective bargaining agreement, and he ordered the company to give the workers an additional paid vacation in the summer. The Eighth Circuit upheld the award on the ground that the arbitrator had not "clearly exceeded" his implied remedial authority under the collective bargaining agreement. Although this is a deferential standard of judicial review, it appears to be somewhat less deferential than when the issue is the interpretation of an explicit contractual provision. The difference is consistent with our approach in the present case. As for the specific result in *Litton:* Since the agreement was violated and the workers suffered losses as a result, the arbitrator was authorized to devise a remedy that would make them whole. The parties could not have intended otherwise when they agreed that violations of the collective bargaining agreement could be taken to arbitration. Now the particular remedy made the workers more than whole, by giving them a second vacation on top of a first vacation that, while not ideal for them, could not have been completely worthless either. But it would have been difficult to devise a remedy that neither undercompensated nor overcompensated them. Here the injured workers—that is, the former Schlitz employees entitled to preferential consideration by Miller over the Miller temporaries who were recalled—could be made whole very simply (more simply than in *Litton*): they just had to be given the preferential consideration that the arbitrator found had been wrongly denied them, with back pay for those whom the preference entitled actually to be hired. No rea-

son was given or appears for going further; and in going further the arbitrator went beyond the scope of the agreement. The district court's order must therefore be modified to make clear that the company's obligation is to hire 39 *qualified* former Schlitz employees, or such lesser number as are qualified if there are not 39 qualified ones. The arbitrator's award did not say what was to happen to the temporary employees whom Miller had recalled, and we express no view on that question.

Besides arguing that the award went beyond the collective bargaining agreement, Miller argues that the preference clause violates the National Labor Relations Act, in which event it cannot be enforced even in the modified form in which we have upheld the award against a challenge that it was not authorized by the agreement. See *General Warehousemen & Helpers Local 767 v. Standard Brands, Inc.,* 579 F.2d 1282, 1292–93 (5th Cir.1978) (en banc), cert. dismissed, 441 U.S. 957, 99 S.Ct. 2420, 60 L.Ed.2d 1075, 443 U.S. 913, 99 S.Ct. 3103, 61 L.Ed.2d 877 (1979). First, Miller contends that as applied to a nonsignatory of the multi-employer collective bargaining agreement the clause discriminates in favor of union members by virtue of the union-shop clause in the agreement, and therefore violates section 8(b)(2) of the Act, 29 U.S.C. § 158(b)(2). Since union-shop clauses are lawful, since an employer is free to and usually does give preference to his own employees over other employees in any collective bargaining agreement he signs, and since all of the employees in a multi-employer bargaining unit are treated as if they were the employees of a single employer, the hiring-preference clause could not have violated section 8(b)(2) when Schlitz was still a member of the unit, even though the clause favored union members (because the union-shop clause assured that the only employees given preference would be union members). Cf. *International Photographers of the Motion Picture Industries,* 197 N.L.R.B. 1187, 1189 (1972), enforced without opinion *sub nom. International Photographers of Motion*

*Picture Industry v. NLRB*, 477 F.2d 450 (D.C.Cir.1973). But, Miller argues, once Schlitz left the unit yet the hiring-preference clause remained applicable to its employees, it is as if Local 9, in negotiating the new collective bargaining agreement with the remaining members of the multi-employer unit, Miller and Pabst, had insisted on a clause requiring that any new employees they hired must be members of Local 9 (at least until all the former employees of Schlitz who wanted to work in the brewery trade in Milwaukee, and had satisfactory work records, had been hired). Such a clause would violate section 8(b)(2).

■ This is an ingenious and technically adequate argument, and derives support from cases such as *Construction, Building Materials & Miscellaneous Drivers, Local No. 83*, 243 N.L.R.B. 328, 333 (1979), where a violation was found because seniority with the employer was based on service only with companies that had collective bargaining agreements with the respondent union. See also *International Photographers of the Motion Picture Industries, supra; Directors Guild of America, Inc.*, 198 N.L.R.B. 707, 709 (1972). Nevertheless, as we shall explain, the argument does not persuade us. But we reject the union's counterargument that the Labor Board approved the arbitrator's application of the hiring-preference clause to Miller's dispute with the union and that its approval should either be given collateral estoppel effect in this case (because Miller was a complaining party in a proceeding before the Board to challenge the union's invocation of the hiring-preference clause) or be treated as an issue that is within the Board's primary jurisdiction, has been resolved by the Board, and should not be reexamined by us. All that happened is that the General Counsel of the Board decided not to bring an unfair labor practice proceeding against the union. This was not an adjudication by the Board; indeed, it was nothing more than an exercise by the General Counsel of his prosecutorial discretion, and as such is entitled neither to be given collateral estoppel effect nor to be treated as an exercise of the Board's pri-

mary jurisdiction. See *Edna H. Pagel, Inc. v. Teamsters Local Union 595*, 667 F.2d 1275, 1279–80 (9th Cir.1982); *Courier-Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 276–77 n. 6 (1st Cir.1983). The union concedes as it must that if the Board has refused to decide the issue we have the power to decide it ourselves, see *Kaiser Steel Co. v. Mullins*, 455 U.S. 72, 83–84, 102 S.Ct. 851, 859–860, 70 L.Ed.2d 833 (1982), and this, we think, is the situation.

We also are not impressed by the union's argument that since many workers default on their union dues during a layoff and as a result can be kicked out of the union, it is uncertain how many of the preferred Schlitz workers are still union members. We doubt that the union would be quick to expel members who were laid off as a result of a strike that the union had called but who still wanted to work in the brewing industry. And we are not convinced that section 8(b)(2) can never be violated unless it is a certainty that all the beneficiaries of preferential treatment are union members, though most surely are.

■ We are impressed, however, by the fact that when the union negotiated the modification of the multi-employer collective bargaining agreement to keep Schlitz workers under the hiring-preference clause, it did so in the reasonable though as it turned out erroneous belief that Schlitz would agree to a reciprocal clause. The intent was thus to continue the arrangement that the Milwaukee brewers had had with the union for many years. Although technically the arrangement would no longer have been part of a multi-employer collective bargaining agreement, we do not think that this difference would be enough by itself to condemn it under section 8(b)(2), added by the Taft-Hartley Act to outlaw the closed shop. See H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 41 (1947), U.S. Code Cong.Serv.1947, p. 1135. The clause had provided a lawful form of job insurance for brewery workers in all the years that Schlitz had been a member of

the multi-employer bargaining unit; and it was natural for all concerned to want to continue this insurance after Schlitz left the unit. True, the continuation of the arrangement did, at least in principle, benefit union members over nonunion members by giving Schlitz employees, who were members of the union, preference over other job applicants who might not be. But the benefit was incidental and maybe nonexistent: the temporary employees whom Miller rehired in lieu of hiring former Schlitz workers were also members of Local 9. There has been no showing of discrimination against nonunion workers in the actual operation of the hiring-preference clause.

██ Miller argues that the award is also illegal because the union breached its duty to represent in good faith all members of the bargaining units it represents; concretely, that it breached its duty to Miller's temporary employees by putting ahead of them the interests of the laid-off Schlitz employees—employees who presumably are no longer members of a collective bargaining unit that the union represents, the Schlitz brewery where they worked having been closed down, but to whom the union still owes (we may assume) a duty of enforcing the rights that it negotiated with Miller and Pabst on their behalf. Although the National Labor Relations Act does implicitly impose on the union a duty to represent all members of the bargaining unit in good faith, *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967), including in this case the Miller temporaries, the duty is not for the benefit of the company. The proper parties to assert it would be the temporary employees, who are the intended beneficiaries. They did seek to intervene in the district court proceeding, but were turned down; they could have tried to appeal (see 7A Wright & Miller, Federal Practice and Procedure § 1923, at pp. 627–30 (1972)), but did not.

We can understand, though, the concern that has led the company to try to assert their rights. Miller is afraid that if it complies with the arbitrator's order by laying off some of its temporaries in order to make room for the former Schlitz employees who have rights under the hiring-preference clause, the temporaries will sue it for breach of the collective bargaining contract and it will not be able to defend on the ground that the union is the exclusive representative of the workers, because if the union breached its duty of fair representation the workers complaining of the breach can sue the company. *Vaca v. Sipes, supra,* 386 U.S. at 186, 87 S.Ct. at 914. The arbitrator's finding that the contract requires the company to give former Schlitz employees priority over its own temporaries could not foreclose the temporaries' claim by the principles of collateral estoppel; the temporaries were not parties to the arbitration proceeding, though they tried to become parties.

But if the company really felt itself caught between the conflicting claims of the Schlitz employees and its own temporary employees, it should have tried to join the latter as additional parties to the arbitration proceeding, or at least should have joined them (as it readily could) as additional parties to the district court proceeding. Having made no attempt to do either of these things the company will not be allowed to assert the temporaries' rights in their absence.

██ This completes our discussion of the substantive issues, but we must also consider whether the district court was right to award the union its attorney's fees. Normally when no statute authorizes the award of attorney's fees in a particular class of cases—and none does with respect to suits under either section 301 of the Taft-Hartley Act or section 9 of the Arbitration Act—the prevailing party is entitled to attorney's fees only if his opponent's suit or defense was frivolous, which our cases define to mean brought in bad faith—brought to harass rather than to win. See, e.g., *McCandless v. Great Atlantic & Pac. Tea Co.*, 697 F.2d 198, 200 (7th Cir.1983). If only because we have reversed the district court in part, so that the company has gotten at least some relief

from the arbitration award, we cannot agree that the company's suit was frivolous. In addition, though we have rejected the company's argument that the award is invalid under section 8(b)(2) of the National Labor Relations Act, that argument is not frivolous either.

The company's resistance to the arbitrator's finding that it violated the preference clause may have been frivolous; but we doubt whether it would be worthwhile, at least as a general rule, to divide a suitor's claims (or defenses) into frivolous and nonfrivolous, and award attorney's fees in respect to the frivolous claims but not the others. The added burden to the court of making this determination would often outweigh the benefit to the party of obtaining a partial award of attorney's fees. Although it is costly to defend against a frivolous suit, the marginal costs of knocking out the frivolous claims in a suit that has a meritorious core usually are not great. True, there are cases where sanctions are awarded for frivolous activity (abusive discovery, for example) in an otherwise meritorious cause, and these could provide a precedent for a partial award of attorney's fees in a case with a mixture of frivolous and nonfrivolous claims, though the discovery sanctions, for example, are specifically authorized by the federal rules. See, e.g., Fed.R.Civ.P. 11, 16(f), 37(a)(4). At any rate here the union in asking for attorney's fees chose to characterize the entire case as frivolous, and we think it should be held to that characterization and not be given a partial award of attorney's fees that it did not seek.

We share with the union and the district court concern lest companies defeat the objectives of labor arbitration clauses that they have voluntarily negotiated by routinely refusing to honor arbitration awards without any valid grounds for doing so, in order to put the union to the expense of getting the award enforced in court. Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRB*, 96 Harv.L.Rev. 1769, 1787–89, 1797 (1983), presents evidence that some companies have decided to thumb their noses at the remedies that labor law provides for unions, in an effort to convince workers that unions are paper tigers. Maybe this is why some courts have applied what appears to be a less demanding standard to fee requests in labor arbitration cases than in other cases, by giving the party successfully defending the award his attorney's fees if the opposition was "without justification." See, e.g., *Amalgamated Meat Cutters Local Union 540 v. Great Western Food Co.*, 712 F.2d 122, 125 (5th Cir. 1983); *International Union of Petroleum & Industrial Workers v. Western Industrial Maintenance, Inc.*, 707 F.2d 425 (9th Cir.1983); *Courier-Citizen Co. v. Boston Electrotypers Union No. 11, supra*, 702 F.2d at 282; *International Ass'n of Machinists v. Texas Steel Co.*, 639 F.2d 279, 283–84 (5th Cir.1981); but cf. *Lackawanna Leather Co. v. United Food & Commercial Workers Int'l Union*, 706 F.2d 228, 232 (8th Cir.1983). Other reasons for the seemingly more liberal standard are the federal policy in favor of arbitration in general and labor arbitration in particular and the fact that, because there are so few grounds for attacking arbitration awards, it is easy to pronounce most such attacks utterly groundless. But we need not decide in this case whether to tilt the standard rule, which in the absence of statute allows an award of attorney's fees only if the suit or defense was frivolous, toward the more liberal rule suggested in the decisions we have just cited. The company's attack on the award was not without foundation. We therefore cannot say that this is a case where the company sought merely to put the union's feet to the fire.

The judgment is reversed in part, and remanded for the limited purpose of enabling the district court to strike the award of attorney's fees and to revise the arbitrator's remedy in accordance with this opinion. But in all other respects the judgment is affirmed. No costs in this court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.