819 F.2d 786
 125 L.R.R.M. (BNA) 2681, 56 USLW 2012,
106 Lab.Cas. P 12,426
 LOCAL 879, ALLIED INDUSTRIAL WORKERS of AMERICA, AFL-CIO,
and International Union, Allied Industrial Workers
of America, AFL-CIO, Plaintiffs-Appellees,
v.
CHRYSLER MARINE CORPORATION and Chrysler Corporation,
Defendants-Appellants.
 No. 85-2872.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 17, 1986.
Decided May 20, 1987.
 
 Frederick A. Muth, Jr., Whyte & Hirschboeck, S.C., Milwaukee, Wis., for defendants-appellants.
 Kenneth R. Loebel, Habush Habush & Davis, Milwaukee, Wis., for plaintiffs-appellees.
 Before CUDAHY and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 Appellants Chrysler Marine Corporation and Chrysler Corporation ("Chrysler" or "the Company") appeal from the district court judgment enforcing an arbitrator's award and awarding attorney's fees to appellees International Union, Allied Industrial Workers of America and Local 879 ("the Union"). Jurisdiction was based on Sec. 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 185. For the reasons set forth below, we will AFFIRM the enforcement of the arbitrator's award, and REVERSE the grant of attorneys' fees.FACTS
 
 
 2
 In May, 1983, Chrysler and the Union began to negotiate a successor agreement to that covering the Company's Hartford and Beaver Dam, Wisconsin, plants, which was due to expire on June 30, 1983. Because of rumors that. Chrysler was considering closing or selling these plants, the Union twice proposed severance pay plans, both of which Chrysler rejected. In agreeing to a new contract, the Union accepted a company letter of intent stating that "in the event the Company should close all of its Hartford and/or Beaver Dam Plants, the Company will provide the Union six (6) months advance notice of such closing and will negotiate with the Union regarding a Severance Pay Plan."
 
 
 3
 In August, 1983, Chrysler began to negotiate with Bayliner Corporation for the sale of the Hartford and Beaver Dam plants. Bayliner agreed to acquire Chrysler's assets, to operate the Hartford plant for one year, excluding a reasonable transition period, and to operate the Beaver Dam plant for at least two months. The sale was originalIy scheduled to become effective December 30, 1983. The agreement was reached December 8, 1983 and the sale was first made known to the Union and the employees at that time.
 
 
 4
 On December 12, 1983, the Union filed a grievance alleging that the sale was a closing which violated the June 30 agreement because six months' notice had not been given. It requested that the closing be delayed for at least six months for negotiation of a severance pay plan. Chrysler denied the grievance, contending that the sale was not a closing, and the issue was ultimately submitted to arbitration.
 
 
 5
 The Union immediately brought suit to enjoin the sale pending arbitration. The district court granted a preliminary injunction, but on January 9, 1984, this court granted a stay, finding that the risk of irreparable injury weighed most heavily against Chrysler. The preliminary injunction was reversed May 31, 1984, 735 F.2d 1367. Both orders were unpublished.
 
 
 6
 On January 11, 1984, Chrysler informed all employees at both plants that effective January 13, 1984, they would no longer be employed. Ownership of the Hartford assets was transferred to the buyer on January 13, 1984, but the Beaver Dam assets were never sold, and operations there continued without interruption. Although Bayliner did not guarantee that the Company's employees would be retained, as of February 6, 1984, 223 of 272 former Chrysler employees were employed at the Hartford plant.
 
 
 7
 The parties then proceeded with arbitration as provided by their collective bargaining agreement. On May 30, 1984, the arbitrator issued an award. The arbitrator found that the term "close" applied to the sale of the Hartford operation and that Chrysler had therefore obligated itself to give six months' notice of the sale, and to negotiate a severance pay plan. He ordered several adjustments, affecting groups of employees, consistent with the theory that the sale could not have occurred less than six months after December 8, 1983, the date the employees learned of it. These adjustments are not in issue on this appeal. He also directed the parties to attempt to agree upon a severance pay plan comparable to plans in comparable relationships. He stated his opinion "that had such negotiations occurred prior to the effectuation of the sale in question, the Union would have been in an advantageous bargaining position, since the Company would probably have sought its acquiescence to a waiver of the six months' notice requirement which would have enabled it to meet the purchaser's demands with respect to the timing of the transaction. Based upon these considerations, it is the undersigned's opinion that the Union would in all likelihood have been able to negotiate a severance pay plan which provided benefits comparable with the more generous of such plans in existence at that time in comparable employee-union relationships."
 
 
 8
 The parties were given 90 days in which to negotiate, after which the proceeding would be reconvened at the request of either party. Chrysler brought an action seeking to set aside the award. The parties did not negotiate, and the arbitrator reconvened the proceeding.
 
 
 9
 A supplemental award was issued on March 15, 1985, including, among other things, a severance pay plan for all former Chrysler employees. The arbitrator reviewed severance pay plans collectively bargained in three plants neighboring Chrysler's. Based upon them, he termed the plan awarded "a fair and generally comparable severance pay plan." The arbitrator stated that because it was impossible to determine with any certainty the Union's and the employees' damages as a result of Chrysler's violation of the contract, he had attempted in the first award to provide an incentive for the Company to reach an agreement with the Union. That having failed, imposition of a severance pay plan is "the most viable way of affording the employees whose contractual rights were violated meaningful relief, and of imposing upon the Company obligations which in any way coincide with the obligations it had at the time of the contractual violation." Supplemental Award at 14. The arbitrator also observed that no lesser or more traditional remedy, such as a cease and desist order or a direction to bargain, could be effective because the parties no longer had a bargaining relationship and Chrysler had no incentive to reach an agreement with the Union. Even employees hired by Bayliner were to receive severance pay, because when Chrysler ceased operations, its employees had no rights to employment with the buyer. Moreover, while one purpose of severance pay is to provide income between jobs, it also compensates employees for their service and for termination for reasons unrelated to their conduct.
 
 
 10
 The district court ordered enforcement of both awards. It found that the arbitrator's construction of the contract did not manifestly ignore the agreement, and that the creation of the severance plan was within the scope of his remedial powers. The court also awarded attorney's fees incurred by the Union to enforce the award.
 
 ARBITRATION AWARD
 
 11
 This court has repeatedly stressed that review of an arbitration award is extremely limited. See International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW and Local 449 v. Keystone Consolidated Industries, Inc., 782 F.2d 1400, 1402 (7th Cir.1986) and cases cited therein. So long as the arbitrator interpreted the contract in making the award, even if arguably incorrectly, it must be upheld. Ethyl Corp. v. United Steelworkers of America, 768 F.2d 180, 187 (7th Cir.1985).
 
 
 12
 An award may be overturned only if the arbitrator must have based his award on his own personal notions of right and wrong, for only then does the award fail "to draw its essence from the collective bargaining agreement" as required by the Supreme Court in United Steelworkers v. Enterprise Wheel, 363 U.S. 593, 597, 80 S.Ct. 1353, 1361, 4 L.Ed.2d 1424, and by ourselves in Ethyl Corporation, 768 F.2d at 184-85; Jones Dairy Farm v. Local No. P-1236, United Food and Commercial Workers International Union, 760 F.2d 173, 176 (7th Cir.1985), certiorari denied, --- U.S. ----, 106 S.Ct. 136, 88 L.Ed.2d 112; Miller Brewing Co. v. Brewery Workers Local Union No. 9, 739 F.2d 1159, 1162 (7th Cir.1984), certiorari denied, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926....
 
 
 13
 This low standard of review is essential to prevent a "judicialization" of the arbitration process. Ethyl Corporation, 768 F.2d at 184. Arbitration is an alternative to the judicial resolution of disputes, and an extremely low standard of review is necessary to prevent arbitration from becoming merely an added preliminary step to judicial resolution rather than a true alternative. Id. The parties have bargained ex ante for arbitration as an alternative means of dispute resolution, and ex post they must abide by this bargain. Camacho [v. Ritz-Carlton Water Tower, 786 F.2d 242, 244 (7th Cir.1986) ].
 
 
 14
 E.I. Dupont de Nemours v. Grasselli Employees Independent Ass'n of East Chicago, Inc., 790 F.2d 611, 614 (7th Cir.1986).
 
 
 15
 Chrysler does not challenge the arbitrator's construction of the collective bargaining agreement nor his finding of a breach by failing to give the Union six months' notice of the sale and failing to negotiate regarding a severance pay plan. Instead, it argues that the remedy awarded exceeds the authority granted to the arbitrator by the contract.
 
 The arbitration clause provides that:
 
 16
 [t]he decision of the arbitrator shall be final, and binding on all parties. The arbitrator shall have authority only to decide questions as to the meaning and application of the terms of this Agreement, and such arbitrator shall have no authority to change existing rate ranges, incentive base rates or day work rates, for any labor grade or to add, delete or modify any of the terms of this Agreement.
 
 
 17
 Chrysler contends that by creating the duty "out of whole cloth" to provide severance pay, the arbitrator modified the terms of the agreement by imposing the obligation to come to terms, where only negotiations had been bargained for. It also argues that the arbitrator's reasoning was faulty, and that the award to employees who were hired by Bayliner exceeds his remedial powers by creating a windfall and contradicting the parties' bargaining history.
 
 
 18
 We disagree.
 
 
 19
 When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There is the need for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet the particular contingency.
 
 
 20
 United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); see Miller Brewing Co. v. Brewery Workers Local Union No. 9, 739 F.2d 1159, 1163 (7th Cir.1984) ("Collective bargaining agreements often say little or nothing about the arbitrator's remedial powers; yet it cannot be that he has none; and since he derives all his powers from the agreement, the agreement must implicitly grant him remedial powers when there is no explicit grant.").
 
 
 21
 Concerning the breadth of such implication, we have said,
 
 
 22
 In these circumstances we must consider whether it is at all plausible to suppose that the remedy he devised was within the contemplation of the parties and hence implicitly authorized by the agreement. Only if we think it clearly was not may we reverse.
 
 
 23
 Id. at 1164. See also United Elec., Radio and Mach. Workers of Am., Local 1139 v. Litton Microwave Cooking Products, 728 F.2d 970, 972 (8th Cir.1984) (en banc); Desert Palace, Inc. v. Local Joint Executive Bd. of Las Vegas, 679 F.2d 789, 793 (9th Cir.1982) (as long as solution is within general framework of agreement, arbitrator may decide what parties would have agreed had they foreseen the dispute).
 
 
 24
 Of course, if Chrysler had given six months' notice of its sale and had negotiated in good faith, but unsuccessfully, for a severance pay plan, no plan could have been imposed upon it under the collective bargaining agreement. Here, however, Chrysler has made it impossible to determine with certainty what would have been the result of negotiation either if six months' notice had been given, or, as seems more likely under the circumstances, Chrysler had also sought a Union waiver of the full six months' notice period. "We cannot say that the arbitrator clearly exceeded his authority or violated the collective-bargaining agreement, when he resolved doubts as to the remedy against the party that had broken its promise." United Electric, 728 F.2d at 972.
 
 
 25
 The arbitrator carried out what appears to be a careful and reasonable determination of a plan which would probably have resulted from negotiation under the latter assumption. Expressly conferring on the arbitrator, as the agreement does, the authority to decide the meaning and application of the agreement, necessarily implies the authority to find that there has been a breach of the agreement as interpreted, and, we think, further implies the authority to prescribe a remedy which can be said reasonably to cure the breach. Thus the award was within the range of remedial authority which can reasonably be said to be implied by the contract.
 
 
 26
 Other remedies did not appear feasible, and Chrysler proposes none; indeed, its position leads to the conclusion that the arbitrator was helpless to provide redress for the Company's breach, a conclusion not mandated by the agreement or by common sense. Cf. Grigoleit Co. v. United Rubber, Cork, Linoleum and Plastic Workers of Am., Local No. 270, 769 F.2d 434, 440-41 (7th Cir.1985); United Elec. Radio & Machine Workers of Am. v. Honeywell, Inc., 522 F.2d 1221, 1226 (7th Cir.1975) (arbitrators have flexibility in formulating remedies); Mogge v. District 8 Int'l Ass'n of Machinists, 454 F.2d 510, 514 (7th Cir.1971) (where contract is not explicit concerning the proper remedy, arbitrator has wide latitude in fashioning appropriate remedy).
 
 
 27
 Chrysler challenges the arbitrator's assumption that the contractual entitlement to six months' notice of the sale gave the Union bargaining power by withholding consent to a shortening of the notice period. In this challenge, Chrysler relies on this court's stay and reversal of a preliminary injunction against proceeding with the sale in January, 1984 after only one month's notice.
 
 
 28
 This argument rests on an inapt comparison between the premises of the court's decision and those of the arbitrator's. This dispute was whether the "sale" was a "closing" under the collective bargaining agreement. That issue had not been resolved when this court decided that Chrysler's risk of irreparable hardship if it lost the sale opportunity and ultimately won on the merits was much greater than the Union's risk if the sale occurred and it ultimately won on the merits. Before the arbitrator prescribed the remedy, however, he had reached the merits and determined the Company's contractual obligation not to sell without six months' notice.
 
 
 29
 This court's two unpublished orders did not, of course, address the merits of the dispute, nor even assess the probability of success. They were plainly based on this court's evaluation of the respective risks of irreparable injury. The stay order (incorporated also in the final order) suggests that this court perceived an award of (if not agreement on) a severance pay plan as at least a very probable outcome, for it said, at page 5:
 
 
 30
 Finally, as we previously stated, if Chrysler is not permitted to complete the sale, there is a substantial likelihood that Chrysler will lose large amounts of money greatly in excess of the $1,000 injunction bond filed by the union in this case. After all, in a large commercial transaction such as this, time is sensitive and of the essence. The union members face no such dilemma. If the sale is completed, the Union still has the opportunity to arbitrate severance pay under the collective bargaining agreement against a solvent Chrysler. If the arbitrator finds an award of severance pay to be proper in this instance, then every union member not hired by Bayliner will be entitled to such pay. The arbitrator's award of severance pay will be in the form of money damages, easily calculable, and within the power of the panel to award. The Union simply cannot complain of irreparable harm if it is remitted to this remedy. Moreover, arbitration may be avoidable since Chrysler has offered to pay in settlement the severance pay proposed by the Union immediately prior to the time the labor contract was signed.
 
 
 31
 Chrysler further points out that most of the affected employees were hired by Bayliner, the purchaser of the Hartford plant. Chrysler seems to contend that even if a severance pay plan is an appropriate remedy, it "must be limited to former hourly Chrysler employees who, despite reasonable efforts, have not secured other employment."
 
 
 32
 It relies on two decisions which held that pension administrators' interpretation of employers' severance pay policies so as not to afford benefits to persons employed by a successor employer did not violate ERISA. Sly v. P.R. Malloy & Co., Inc., 712 F.2d 1209 (7th Cir.1983) and Jung v. FMC Corp., 755 F.2d 708 (9th Cir.1985). These cases involved different situations and have little pertinence here.
 
 ATTORNEY'S FEES
 
 33
 The district court also awarded the Union attorney's fees incurred to enforce the award, but without any explanation, or finding of bad faith or frivolous litigation. Some courts have held that although Sec. 301 of the LMRA does not provide for the shifting of costs and fees in suits for enforcement of awards, when a challenger refuses to abide by an arbitrator's decision "without justification," attorney's fees and costs may be awarded. See, e.g., Teamsters Local Union No. 764 v. J.H. Merritt & Co., 770 F.2d 40, 43 n. 2 (3rd Cir.1985); Amalgamated Meat Cutters Local Union 540 v. Great Western Food Co., 712 F.2d 122, 125 (5th Cir.1983); Int'l Union of Petroleum & Indus. Workers v. Western Indus. Maintenance, Inc., 707 F.2d 425, 428-29 (9th Cir.1983).
 
 
 34
 This court has stated that normally when no statute authorizes the award of attorney's fees "the prevailing party is entitled to attorney's fees only if his opponent's suit or defense was frivolous, which our cases define to mean brought in bad faith--brought to harass rather than to win." Miller, 739 F.2d at 1167. More recently, since the amendment of Rule 11, F.R.Civ.P., we have held that the test under present Rule 11 is objective, and that a finding of bad faith is not essential. See Brown v. National Bd. of Medical Examiners, 800 F.2d 168, 171 (7th Cir.1986) (standard under revised Rule 11 is objective reasonableness under the circumstances). Here there was no finding of bad faith, nor do we see evidence thereof. We do not deem Chrysler's position so devoid of arguable merit as to warrant sanctions under Rule 11.
 
 
 35
 The award of attorney's fees is REVERSED, and the judgment is AFFIRMED in all other respects. Costs on appeal are allowed to plaintiffs.
 
 
 36
 COFFEY, Circuit Judge, dissenting in part.
 
 
 37
 The Majority in upholding the arbitrator's award of severance pay to all former employees of Chrysler Marine permits those employees who were reemployed by U.S. Marine to receive an unjustifiable windfall payment at Chrysler's expense in spite of the fact that the rehired employees had received back pay for the one week the Hartford plant was closed. The Majority in effect has approved the arbitrator's amendment to the collective bargaining agreement and completely ignored the specific terms of the agreement between the union and Chrysler which specifically stated that the arbitrator shall not "add, delete or modify any of the terms of this Agreement." Further, the Majority, in enforcing the arbitrator's award of severance pay to all former Chrysler employees regardless of whether they were rehired by U.S. Marine ignores the parties' intention that severance pay, if it was ever to be awarded, by its very definition was only intended to serve the limited purpose of providing a transition allowance for employees terminated by Chrysler until they found new employment. Contrary to the intent of the parties, the arbitrator's award provides all Chrysler employees with the windfall payment they shall now receive as a result of this court's approval of the arbitrator's award. Because the arbitrator awarded severance pay despite the fact that the collective bargaining agreement contains no provision regarding severance pay, the arbitrator's award constitutes an amendment to the collective bargaining agreement contrary to the express terms of the agreement and has no basis in the record. Therefore, I dissent from that portion of the Majority opinion affirming the district court's order and approving the arbitrator's grant of a windfall payment in the form of severance pay to all Chrysler employees including those employees rehired by U.S. Marine.
 
 
 38
 Although this court's review of an arbitration award is limited, that does not mean we are powerless to overturn awards that are clearly not intended by the parties to the collective bargaining agreement. As we explained in Young Radiator Company v. International Union UAW, 734 F.2d 321, 323 (7th Cir.1984):
 
 
 39
 "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."
 
 
 40
 (quoting United States of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)) (footnote omitted). We further stated in Ethyl Corporation v. U.S. Steelworkers of America, 768 F.2d 180, 187 (7th Cir.1985):
 
 
 41
 "This is not to say that simply by making the right noises--noises of contract interpretation--an arbitrator can shield from judicial correction an outlandish disposition of a grievance. There are cases, such as our Young Radiator case cited earlier, where no hypothesis other than that the arbitrator was importing into the dispute his own ideas of industrial justice would be tenable, no matter what he said."
 
 
 42
 See also, Hill v. Norfolk & Western Ry., 814 F.2d 1192 (7th Cir.1987). Here, the arbitrator superimposed a severance pay plan onto the collective bargaining agreement which did not provide for a severance pay plan itself and in so doing he added to the terms of the collective bargaining agreement contrary to the express language of the agreement. The agreement provided that
 
 
 43
 "The arbitrator shall have authority only to decide questions as to the meaning and application of the terms of this Agreement, and such arbitrator shall have no authority to change existing rate ranges, incentive base rates or duty work rates, for any labor grade or to add, delete or modify any of the terms of this Agreement."
 
 
 44
 Article 3, sec. 302 (step 5) (emphasis added). The collective bargaining agreement itself fails to contain any reference to severance pay. The only reference to severance pay in the record is in the "letter of understanding"[1] that was made part of the collective bargaining agreement when Chrysler and the union were unable to reach an agreement concerning severance pay during negotiations in June of 1983. The "letter of understanding" provided merely that Chrysler would attempt to negotiate a severance pay plan should it close its Hartford or Beaver Dam plant. Thus, a careful reading of the collective bargaining agreement makes clear that Chrysler and the union had not agreed that severance pay would be provided if it "closed" its plants and that the intention of the parties at the time the collective bargaining agreement was accepted by Chrysler and the union in June of 1983 was only that Chrysler and the union would attempt to negotiate a severance pay plan should Chrysler "close" its plants. The arbitrator, disregarding the explicit terms of the agreement, claimed he premised his award of severance pay on the "letter of understanding" between Chrysler and the union. Since the letter of understanding provided only that Chrysler would attempt to negotiate a severance pay plan if it sold the Hartford and/or Beaver Dam plants, the arbitrator clearly exceeded the scope of his authority in imposing a severance pay plan that had been rejected by the parties during their negotiations in June of 1983, and again rejected by the union in December of 1983 even after Chrysler had offered to accept the severance pay plan the union had proposed in June of 1983. Thus the arbitrator read into the collective bargaining agreement a provision the parties themselves had clearly rejected during their negotiations concerning the agreement.
 
 
 45
 Despite the unambiguous language in the agreement that the arbitrator "shall not add, delete or modify any of the terms of this Agreement" and the conspicuous absence of any severance pay provision in the agreement, the Majority approves the arbitrator's award of severance pay for 223 rehired employees. In so doing, the Majority approves the arbitrator's grasping at straws for some means to justify and support his award which directly contravenes the terms of the collective bargaining agreement prohibiting the arbitrator from "adding to or modifying" the agreement. The collective bargaining agreement itself makes no mention of an obligation on Chrysler's part to provide severance pay. The union turned down Chrysler's offer of severance pay in December of 1983 after Chrysler notified the union of its intent to sell the Hartford plant. The collective bargaining agreement provided that:
 
 
 46
 "The arbitrator shall have authority only to decide questions as to the meaning and application of the terms of this Agreement, and such arbitrator shall have no authority to change existing rate ranges, incentive base rates or duty work rates, for any labor grade or to add, delete or modify any of the terms of this Agreement."
 
 
 47
 Contrary to the express language and intent of the parties to the collective bargaining agreement, the arbitrator amended the agreement with the imposition of a severance pay plan on Chrysler covering all Chrysler's employees including those 223 employees who were gainfully reemployed within one week of the sale of the Hartford plant. The arbitrator attempted to justify his action in amending the contract claiming that his implicit remedial powers authorized him to impose his own predilection of a severance pay plan on Chrysler since Chrysler failed to provide the union with six months notice of its intent to sell the Hartford plant. Although an arbitrator may fashion a remedy for breach of a collective bargaining agreement, this court has made it clear that any such remedy must of necessity be based on the intentions of the parties to the collective bargaining agreement and not on the arbitrator's "personal notion of justice." As we noted in Miller Brewing v. Brewery Workers Local Union No. 9, 739 F.2d 1159, 1164 (7th Cir.1984), an arbitrator may in limited situations exercise remedial powers not expressly granted in the collective bargaining agreement but that does not mean a reviewing court can never determine "whether an arbitrator when he formulates a particular remedy is interpreting his implied remedial authority or implementing some personal notion of justice."
 
 
 48
 Implying a promise to provide severance pay when the "letter of understanding" between Chrysler and the union fails to set forth any such promise and pledges only to negotiate in the future a severance pay plan surpasses all latitude we should grant to arbitrators. Indeed, the record makes clear that the arbitrator was inventing a severance pay clause rather than construing the collective bargaining agreement, and thus the severance pay plan he imposed on Chrysler reflected only the arbitrator's "personal notion of justice." The arbitrator failed to acknowledge that Chrysler had attempted to protect its employees during the negotiations with U.S. Marine concerning the sale of the plant. Chrysler, in the interest of its employees, made it a condition precedent to the sale of its Hartford plant, that U.S. Marine continue to operate the Hartford plant for one year after the sale. Further, Chrysler attempted to negotiate with the union after it had notified the union in December 1983 of its intent to sell the Hartford plant, offering to accept the severance pay plan proposed by the union but rejected by Chrysler immediately prior to the parties' acceptance of the collective bargaining agreement in June of 1983. The arbitrator without any basis in the record assumed, despite our previous order of January 9, 1984, to the contrary (unpublished decision in case no. 84-1006), that had Chrysler provided the union with six months' notice of its intent to sell the Hartford plant, the union could have somehow impeded or threatened the proposed sale of the plant. According to the arbitrator, since Chrysler stood to lose some $25 million if the sale to U.S. Marine was not consummated (as this court noted in its order of January 9, 1984), by threatening to stop the sale the union could have forced Chrysler to accept whatever severance pay plan the union determined appropriate. The arbitrator stated:
 
 
 49
 "that had such negotiations [between Chrysler and the union concerning severance pay] occurred prior to the effectuation of the sale in question, the Union would have been in an advantageous bargaining position, since the Company would probably have sought its acquiescence to a waiver of the six months' notice requirement which would have enabled it to meet the purchaser's demands with respect to the timing of the transaction. Based upon these considerations, it is the undersigned's opinion that the Union would in all likelihood have been able to negotiate a severance pay plan which provided benefits comparable with the more generous of such plans in existence at that time in comparable employee-union relationships."
 
 
 50
 If we analyze the arbitrator's decision in light of our previous orders in this case, it is clear that the arbitrator erroneously concluded that despite the absence of any obligation in the terms of the collective bargaining agreement (or the "letter of understanding") to agree to a severance pay plan, Chrysler would have been forced by the union to accept any severance pay plan proffered by the union. But the arbitrator's belief that the union would have been in a superior bargaining position had Chrysler complied with the notice provision and negotiated with the union is without support in the record and ignores our previous order refusing to enjoin the sale of the Hartford plant. As this court stated in its orders of January 9, 1984 and May 31, 1984:
 
 
 51
 "At the time the district court entered the preliminary injunction, the Union was not threatened with irreparable harm and, clearly, the balance of hardships weighed in Chrysler's rather than the Union's favor. Accordingly, we hold that the four prong test set forth in Panoramic was not satisfied and thus, the district court abused its discretion in entering the preliminary injunction in the first instance."
 
 
 52
 May 31, 1984 Order. Thus, the union was without any legal authority to stop or impede Chrysler's proposed sale of the Hartford plant and the arbitrator's decision completely disregards our previous orders in this case. Furthermore, the union's bargaining position was substantially inferior at the time Chrysler announced its intent to sell the Hartford plant than it was the previous summer (June 1983) when the parties were negotiating the collective bargaining agreement, since under the terms of the collective bargaining agreement, the union was prohibited from striking or taking any other action that would slow down production, etc. at the plant.[2] The arbitrator's position is untenable because from this record I am convinced that the union's bargaining position reached its peak in June of 1983 six months prior to Chrysler's announcement that it intended to sell the plants at Hartford and Beaver Dam, when the parties were negotiating the collective bargaining agreement, at which time the union could have struck Chrysler upon the expiration of the previous collective bargaining agreement. Even though the record is clear that even at the height of its bargaining power in June of 1983, the union was unable to "force" Chrysler to accept a severance pay plan as Chrysler refused to accept the union proposals concerning severance pay despite the authority of the union to strike Chrysler at that time. The arbitrator took it upon himself to impose a severance pay plan on Chrysler that the union was unable to obtain through collective bargaining, and that the union had in fact rejected in December of 1983 after Chrysler offered the union the very severance pay plan the union itself proposed during negotiations in June of 1983. I fail to understand how the Majority can conclude that the arbitrator's award is based on anything other than "some personal notion of justice" and thus, is not entitled to enforcement since it "fails to draw its essence from the terms of the collective bargaining agreement." The imposition of the severance pay plan is contrary to the explicit language in the collective bargaining agreement stating that the arbitrator shall not "add, delete or modify any of the terms of this Agreement." As we explained in our order of January 9, 1984, Chrysler's employees would be the real losers if the proposed sale was not consummated:
 
 
 53
 "Union members would also be harmed if the sale of assets is not completed because they assuredly would have no employment at the Beaver Dam and Hartford plants once Chrysler closed. On the other hand, if Chrysler completes the sale of assets on January 9, 1984, Bayliner has agreed to keep the Beaver Dam plant open for at least two months and the Hartford plant open for at least one year. In light of the fact that Bayliner has agreed to consider hiring all the union members presently employed at Chrysler's Beaver Dam and Hartford plants, thereby providing them with wages and benefits virtually identical to that they now receive, union members will have a probability of continued employment in the Beaver Dam and Hartford plants. This is so, despite the fact that the collective bargaining agreement between Chrysler and the Union contains no successor clause, entitling union members to be rehired upon Chrysler's sale of assets."
 
 
 54
 Thus, because the arbitrator's award "demonstrates an infidelity to the plain restrictive terms of the contract" which expressly preclude the arbitrator from amending or adding to the collective bargaining agreement, I would deny enforcement of the award on these grounds alone.
 
 
 55
 However, the arbitrator's award is not entitled to enforcement for another reason as well. Even assuming that the record somehow supported the imposition of a severance pay plan on Chrysler, the terms of the plan imposed by the arbitrator clearly conflict with and are beyond the intentions of the parties and again reflect "some personal notion of justice." The severance pay plan imposed on Chrysler by the arbitrator requires Chrysler to compensate all of its employees regardless of whether the employee continued employment with U.S. Marine after Chrysler sold the Hartford plant. In effect, the award provides a windfall payment to the 223 Chrysler employees who were rehired by U.S. Marine (with better benefits than Chrysler had provided) and who lost only one week of work. I agree and Chrysler does not contest the arbitrator's award of one weeks back pay to all 223 former Chrysler employees for the one week the Hartford plant remained closed during the transfer of ownership from Chrysler to U.S. Marine. Providing the rehired Chrysler employees with back pay is proper and reasonable, but to give those employees who continued their employment except for a one-week interruption for which they were compensated severance pay in addition to back pay is ludicrous and penalizes Chrysler for looking out for its employees' best interests. Not only is it contrary to the very purpose of severance pay to provide the reemployed Chrysler workers with a windfall payment in addition to their wages not available to their unfortunate colleagues who lost their jobs completely, but such a result is contrary to the clearly expressed intentions of the parties concerning the purpose that severance pay was to serve. The union's proposed severance pay plan, which was submitted during the negotiations involving the collective bargaining agreement in June of 1983, six months prior to Chrysler's announcement that it would sell the Hartford (and Beaver Dam) plant, clearly stated in unambiguous terms that the purpose of severance pay was to "provide a sufficient transition allowance ... between the termination of employment at Chrysler ... and obtaining new employment":
 
 
 56
 "2. It is recognized that the purpose of severance pay is to provide a sufficient transition allowance to cover a reasonable period of time between the termination of employment at Chrysler Outboard Corporation, and obtaining new employment for persons having through past service, fulfilled the qualifications herein set forth: ..."
 
 As we stated in Miller Brewing:
 
 57
 "In these circumstances we must consider whether it is at all plausible to suppose that the remedy he devised was within the contemplation of the parties and hence implicitly authorized by the agreement."
 
 
 58
 739 F.2d at 1164. Any severance pay plan, including the plan contemplated by the union (and Chrysler), is intended to serve the limited purpose of providing "a sufficient transition allowance ... between the termination of employment at Chrysler Outboard Corporation, and obtaining new employment...." We explained in our January 9, 1984 order:
 
 
 59
 "If the sale is completed, the Union still has the opportunity to arbitrate severance pay under the collective bargaining agreement against a solvent Chrysler. If the arbitrator finds an award of severance pay to be proper in this instance, then every union member not hired by Bayliner will be entitled to such pay. The arbitrator's award of severance pay will be in the form of monetary damages, easily calculable, and within the power of the panel to award. The Union simply cannot complain of irreparable harm if it is remitted to this remedy. Moreover, arbitration may be avoidable since Chrysler has offered to pay in settlement the severance pay proposed by the Union immediately prior to the time the labor contract was signed."
 
 
 60
 The 223 Chrysler employees rehired by U.S. Marine were compensated for the week's wages they lost when the Hartford plant was closed for one week by the arbitrator's back pay award. There was, for these 223 employees, no "transition period" between their employment at Chrysler and their reemployment by U.S. Marine; thus, these employees were not entitled to any special "allowance" to tide them over between jobs. These employees received full compensation for the one week of lost wages in the form of back pay. Moreover, the limited purpose severance pay is intended to serve was acknowledged by this court in Sly v. P.R. Mallory & Company, 712 F.2d 1209, 1211 (7th Cir.1983). In Sly, the plaintiffs brought suit to recover severance pay they asserted was owing to them as a result of Mallory's sale of its metallurgical division to CMW. The plaintiffs were terminated by Mallory as of the date the metallurgical division was sold but were reemployed by the new owner of the division, CMW. This court stated that:
 
 
 61
 " 'Severance pay is generally intended to tide an employee over while seeking a new job and should be considered an unemployment benefit.' "
 
 
 62
 Sly, 712 F.2d at 1211 (quoting district court). Indeed, a member of the Majority, (J. Fairchild sitting by designation on the Ninth Circuit) adopted this definition of severance pay in a decision he authored less than two years ago:
 
 
 63
 "the plan, read as a whole, anticipated the recipient of severance benefits to be without employment ... awarding benefits [to rehired employees] ... would result in a windfall to the employees...."
 
 
 64
 Jung v. FMC Corporation, 755 F.2d 708, 715 (9th Cir.1985) (Fairchild, J.) (emphasis added). Jung also quoted directly from Sly to explain that severance pay was intended to tide a terminated employee over until the employee found a new job. Jung, 755 F.2d at 713. Other courts have also recognized the limited purpose of an award of severance pay. See e.g., Pinto v. Zenith Radio Corp., 480 F.Supp. 361, 363 (N.D.Ill.1979) (employee not entitled to severance pay where he lost no work and could not establish that severance pay was intended to constitute a bonus for past work). Owens v. Press Pub. Co., 34 N.J.Super. 203, 111 A.2d 796, 799, 800 (N.J.Super.L.1955) (purpose of severance "is to carry an employee for an interim period after termination of employment ..."). See also Labor Relations Expediter 635 (BNA 1985) (severance pay is "normally intended to help tide the employee over a period of unemployment immediately following termination"). In Bruch v. Firestone Tire & Rubber Co., 640 F.Supp. 519, 525 (E.D.Pa.1986) the court in denying the plaintiff's claim for severance pay stated:
 
 
 65
 "Although these two documents provide little guidance in defining the term 'reduction in force,' it is noteworthy that nothing in these documents suggests that a reduction in force would occur at the time of the sale of an operation as an ongoing business. General common usage of severance pay comports with the conclusion that termination pay would not be paid to employes who remain in the same job and continue to draw the same wage after the sale of a plant as an ongoing business. These employees suffered none of the hardships normally associated with a termination or reduction in force; they had no period of unemployment without income. Plaintiffs were immediately rehired by Occidental without missing a day of work."
 
 
 66
 See also Davidson v. Firestone Tire & Rubber Co., No. 84-1215 Slip Op. at 5 (W.D.Tenn. April 21, 1986)(emphasis added):
 
 
 67
 "Just as an employee who is rehired no longer has a need for termination pay, an employee who never leaves his job when a Firestone division is sold as a going concern has no reasonable expectation of receiving termination payments. Put simply, the termination pay program was intended to help those employees defendant Firestone believed needed the help, and not to give windfalls to former employees who did not need the help."
 
 
 68
 Furthermore, the union provided no evidence that a severance pay plan should amount to a handout to employees who did not permanently lose their jobs. Thus, the arbitrator's award is without any basis in the record and therefore it is premised on nothing other than the arbitrator's "personal notion of justice" which the arbitrator without authority decided to read into the collective bargaining agreement. It is also interesting to note that the arbitrator attempted to justify his decision to impose a severance pay plan on Chrysler on the basis of the prior June 1983 negotiations between the parties. According to the arbitrator, the June 1983 negotiations was evidence that the parties intended the "closing" of a plant to result in an agreement as to severance pay for Chrysler employees; however, the arbitrator selectively disregarded the evidence from those negotiations establishing that the union's proposed severance pay plan would serve a limited purpose-providing a transition allowance between jobs for those Chrysler employees who were permanently terminated by the "closing" of a plant for the wages lost while seeking new employment. Since those Chrysler employees rehired by U.S. Marine were not forced to find new employment as a result of the sale of the Hartford plant, the clear intent of the parties as to whom, if anyone, was entitled to severance pay was evidenced by their prior negotiations concerning severance pay. Thus, the arbitrator's severance pay plan imposed on the employer (Chrysler) fails to draw its essence from the collective bargaining agreement and therefore is not entitled to enforcement as it reflects nothing but the arbitrator's "personal notion of justice."
 
 
 69
 Because the arbitrator's award imposing a severance pay plan on Chrysler which requires Chrysler to provide severance pay to all its former employees including those who were rehired by U.S. Marine after the sale of the Hartford plant is based on nothing other than the arbitrator's "personal notions of justice" and because it does not draw its essence from the collective bargaining agreement, I dissent from that portion of the Majority opinion enforcing the award and providing the reemployed Chrysler workers with an "unjustified windfall." The Majority's unwarranted intercession on behalf of the union throws another financial curve ball at American industry which is currently struggling for survival against foreign competition-competition unhindered by the imposition of ridiculous severance pay awards in foreign countries such as that invented by the arbitrator in this case and accepted by the Majority at a cost of over $1.3 million to Chrysler. The function of the courts is to ensure that both sides-Labor and management, are treated fairly and equitably. Today, the court legislates a new purpose for severance pay and in so doing tightens the straightjacket on American industry. Although on the surface the Majority's decision may appear as a victory for labor, both labor and management lose in the long run when courts needlessly approve arbitration awards penalizing employers-employers who, like Chrysler, often consider the best interests of their employees in the decisionmaking calculus. In the future, Chrysler and other employers will decline even to sit down and discuss a "letter of understanding" if a mere promise to negotiate can be transformed into a substantive promise as the arbitrator did in the instant case, for then a mere promise to notify the union of the possibility of a sale becomes a blank check for the future which the arbitrator may then use to impose terms on the parties that are clearly contrary to their intent. No sane employer will write such a blank check, and the result will be that bargains of this nature are off limits, and both labor and management alike will suffer. Non-union employers will obviously gain a competitive advantage because they will not be exposed to whimsical decisions of arbitrators. Clearly, a failure to enforce the limits of an arbitrator's power where he manifestly abuses his power will lead people, in the future, to give less and less authority to arbitrators and to write fewer contracts of any kind. I cannot remain silent while another unwarranted arbitrator's decision is approved by a court thus firing another economic projectile into the very heart of the competitiveness of another American industry struggling to keep afloat against unrestrained foreign competition. See Wangen v. Ford Motor Co., 97 Wis.2d 260, 327, 294 N.W.2d 437 (1980) (Coffey, J., dissenting) (criticizing imposition of punitive damages on manufacturer in products liability as magnifying American industry's competitive disadvantage against foreign competition).
 
 
 
 [1]
 The letter of understanding provided:
 "During the term of the Labor Agreement which became effective July 1, 1983 between the Allied Industrial Workers of America, AFL-CIO and its Local 879 and Chrysler Outboard Corporation, it is the Company's intent that in the event the Company should close all of its Hartford and/or Beaver Dam plants, the Company will provide the Union six (6) months advance notice of closing and will negotiate with the Union regarding a Severance Pay Plan."
 The arbitrator determined that the term "close" as used in the letter of understanding applied to the situation where Chrysler terminated its employees and they were reemployed by U.S. Marine one week later. On appeal, Chrysler does not contest the arbitrator's decision concerning what the term "close" means in the letter of understanding. Chrysler's Hartford, Wisconsin plant is the only plant that was "closed" because of the sale to U.S. Marine and the contested severance pay plan concerns only the Hartford plant's employees.
 
 
 [2]
 Section 2.07 of the Collective Bargaining Agreement provided, "... The Union agrees that there will be no strikes, sitdowns, slowdowns, or work stoppage during the term of this Agreement."