**CHICAGO NEWSPAPER PUBLISHERS' ASSOCIATION, Plaintiff-Appellant, Cross-Appellee,**

v.

**CHICAGO WEB PRINTING PRESSMEN'S UNION NO. 7, Defendant-Appellee, Cross-Appellant.**

**Nos. 85–2464, 85–2492.**

United States Court of Appeals, Seventh Circuit.

Argued April 17, 1987.

Decided June 1, 1987.

As Amended June 8, 1987.

L. Michael Zinser, King, Ballow & Little, Ltd., Nashville, Ind., for plaintiff-appellant, cross-appellee.

Sheldon M. Charone, Carmell, Charone, Widmer & Mathews, Ltd., Chicago, Ill., for defendant-appellee, cross-appellant.

Before CUDAHY and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

COFFEY, Circuit Judge.

Plaintiff-appellant Chicago Newspaper Publishers' Association appeals the order of the district court enforcing an arbitrator's decision interpreting the collective bargaining agreement between the respective parties. We affirm.

## I

The appellant, Chicago Newspaper Publishers' Association ("CNPA") represents the Chicago Tribune in labor negotiations while the appellee Chicago Web Printing Pressmen's Union No. 7 ("Union") represents the journeymen pressroom employees employed by the Chicago Tribune. Journeymen pressmen are employees who have worked for a sufficient period of time (usually four years) as apprentice pressmen and upon the successful completion of their apprenticeship are advanced to journeyman status. Over the past 40 years, journeymen pressmen working for the Tribune were hired from the Union's call room.[1] These journeymen obtained their positions with the Tribune on the basis of their union call room seniority.

On February 29, 1980, the CNPA and the Union entered into a collective bargaining agreement retroactively effective from April 3, 1974 and continuing in effect until April 3, 1985. The agreement stated in section 23 that "[i]t is understood that apprentices will be graduated to journeymen as their term of apprenticeship expires, except by mutual agreement."[2] The term of

---

[1] The union call room is located within the union's headquarters and the members are required to report there in order that they might receive work assignments.

[2] Section 23 states:

"(a) The parties to this Agreement recognize and accept mutual responsibility in the establishment and maintenance of an adequate system of apprenticeship and guarantees are hereby given by the parties hereto to give apprentices ample opportunity for the development of the necessary mechanical and executive experience in order to assure competent craftsmanship. Apprentices shall be registered in triplicate form, the apprentice's certificate to be signed by the publisher or foreman of the newspaper on which the apprentice is employed and by the representative of the local office of the Union, each holding a copy of the certificate of apprenticeship and the third copy to be held by the President of the International Printing and Graphic Communications Union.

(b) Each Office may have at least one apprentice for each nine journeymen regularly employed, and as many junior pressmen selected by the employer as outlined in Section 25 as desired by each office, but in no event shall the number be less than stipulated in Section 26. It is understood that apprentices will be graduated to journeymen as their term of apprenticeship expires, except by mutual agreement. Candidates for apprentices shall be not less than 19 years of age, shall be of good character, physical strength and fitness, shall have had a four-year high school edu-

apprenticeship was four years. Section 7 of the agreement gave management the exclusive authority and control "of each pressroom and all its work and all its employees." [3] Section 4 provided that the Union would "furnish as many competent skilled journeymen as are called for by the Employer for the operation of its presses in the respective pressrooms." [4] Section 5 obligated the "Employer" to give preference in hiring to "persons who have worked as journeymen pressmen in the pressrooms of the Employer within the preceding two-year period" [5] and in section 43 of the

cation, and shall file with their application two references from persons other than parents as to their qualifications, except that this shall not disqualify any Junior Pressman employed as of April 3, 1958 who has met all the requirements of the immediately preceding contract, or who on April 3, 1958, was making an effort to meet such requirements and continues diligently to pursue such effort. Apprentices may be placed in the discretion of the employer at any task pertaining to the operation in the pressroom at any time but such help shall not be used regularly to do journeymen work.

(c) In the selection of apprentices preference shall be given to qualified junior pressmen having experience in pressrooms in the Chicago metropolitan area and in such selection, efficiency and length of service in such pressrooms shall govern. The Apprenticeship system herein established is not intended and will not be permitted to abridge the right of the Employer to determine the number of Junior Pressmen to be employed, except as provided in Section 19, but only to create a definite system of instruction, promotion and advancement for all those worthy of it with appropriate and certain increases in pay. A board of not more than six to consist of equal representation for the Union and the Employer shall be set up, (1) to select the apprentices, (b) to determine and settle any questions involving Junior Pressmen or Apprentices, and (c) meet for the purpose of establishing and maintaining a training program, but this shall not abridge the rights of the individual office as set forth in this contract with respect to the establishment or continuation of its individual training programs, provided that such programs do not conflict with other terms of the agreement. The majority vote of this Board will be final and binding.

(d) The term of apprenticeship shall be four years. At the satisfactory conclusion of his term of apprenticeship, an apprentice shall be eligible for journeyman membership in the Union. The office may employ new apprentices at any time, provided that the addition of a new apprentice does not increase the total number of apprentices beyond the number prescribed for the office under the terms of this Agreement. If, in the opinion of the Examining Board, as provided in Section 23(e), said apprentice is not yet qualified to receive his journeyman card he may be sent back to serve additional time on his appren-

ticeship, pending further examination by the Board.

\* \* \* \* \* \*

(g) The Union agrees that every facility and encouragement shall be accorded apprentices in carrying out its share of the mutual responsibility for developing competent journeymen."

3. Section 7 states:

"The authority and control of each pressroom and all its work and all its employees shall be vested exclusively in the Office or its representative. The wages and hours of work of a foreman, acting foreman or assistant foreman is to be a matter of mutual agreement between them and the individual office. No foreman, acting foreman or assistant foreman shall be subject to fine, discipline or expulsion by the Union for any act they may perform as foremen in carrying out the terms of this Agreement. Each Office shall designate a foreman who shall be its representative and whose orders, which shall always be in conformity with the expressed terms of this Agreement, shall in all instances be complied with.

In the event the Union has a grievance against a foreman, assistant foreman, or acting foreman, it shall first refer such grievance to the business manager or general manager of the Office or his designated representative, and if such difference is not adjusted, it may then be referred to the Joint Standing Committee as herein provided for settlement."

4. Section 4 in its entirety states:

"The Union offers to furnish as many competent skilled journeymen as are called for by the Employer for the operation of its presses in the respective pressrooms."

5. Section 5 states:

"The Employer agrees that in the employment of journeymen pressmen, preference will be given to persons who have worked as journeymen pressmen in the pressrooms of the Employer within the preceding two-year period. When a journeyman is requested for a night crew the Employer insofar as possible, shall make his call for same before 5 o'clock, p.m. When journeymen are called for by an office, it shall make such request for such help to the official representative of the Union at official Union headquarters. The Union agrees to furnish such help for morning papers within four hours, and for afternoon

agreement the Employer and the Union "recognize[d] the need for the continuing existence of the call room." The agreement also provided for an arbitration procedure through which disagreements concerning the interpretation of the contract would be resolved.[6] Finally, section 46 of the agreement stated that the written "contract ... shall constitute the entire agreement between the parties."

In October 1983, the Tribune requested that the Union refer twenty journeymen from its call room for positions in its pressroom. The Union refused to refer the journeymen unless the company would agree to give the journeymen lifetime job guarantees. After negotiating with the Union over the referrals, the Tribune promoted nineteen apprentice pressmen in June, 1984 to fill the vacant journeymen positions and thereby bypassed the Union's call room procedure. The Union maintains that it was ready to agree to supply the journeymen to the Tribune without lifetime job guarantees immediately prior to the June 1984 promotions. The Union claimed that the Tribune's action violated the collective bargaining agreement and sought arbitration. The arbitrator held two days of hearings in November, 1984 and issued an award and ruled in the Union's favor on March 27, 1985.

In his decision, the arbitrator rejected the CNPA's argument that section 46 of the agreement precluded him from considering past practice in determining whether the Tribune had violated the agreement. The

arbitrator acknowledged that he could not modify the contract under section 46 but that the agreement did not contain a provision that prohibited the arbitrator from considering the past practices of the parties when construing the contract. The arbitrator then discussed sections 4, 5, and 43 of the agreement and concluded that those provisions mandated that the Tribune use the Union's call room when hiring journeymen pressmen.

The CNPA initiated this suit in the district court under section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, to vacate and set aside the arbitration award. The court granted summary judgment in favor of the Union and ordered enforcement of the arbitration award.

## II

"Ever since federal courts began enforcing arbitration awards, the scope of judicial review of the award has been extremely narrow." *Ethyl Corporation v. United Steelworkers of America, AFL–CIO–CLC*, 768 F.2d 180, 183 (7th Cir.1985). In *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), the United States Supreme Court stated:

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to for-

papers within eight hours after receipt of such request."

6. Section 37 states:

"A Joint Standing Committee shall be maintained to consist of two representatives of the Employer and two representatives of the Union and in case of a vacancy, prolonged absence, or refusal of a representative to act, another shall immediately be appointed in his place, to which committee shall be referred all questions which may arise as to the construction to be placed upon any of the clauses of this Agreement or any alleged violations thereof, which cannot be settled otherwise. The decision of the Committee shall be by the majority vote of all its members. Such Joint Standing Committee shall meet within seven (7) days after any question or difference shall have been referred to it for decision by the

authorized representatives of either party to this Agreement.

If the Joint Standing Committee shall fail to agree within ten (10) days (this time may be extended by mutual agreement) after a dispute is first considered by it, then at the request of either party hereto, they shall select an impartial arbitrator to hear the dispute whose decision shall be final and binding on both parties. Said arbitrator shall be chosen in any manner agreed to by the parties, but if after fifteen (15) days the parties are unable to agree on an arbitrator, he shall be selected on the written request of either party from a panel or panels of arbitrators provided by the American Arbitration Association. The arbitrator shall not have jurisdiction or authority to add to, subtract from, or modify this Agreement."

mulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."

*Id.* at 597, 80 S.Ct. at 1361. In *Randall v. Lodge No. 1076, International Association of Machinists and Aerospace-Workers, AFL–CIO,* 648 F.2d 462, 465 (7th Cir. 1981), we stated that "the arbitrator's decision should not be upset unless it is arbitrary or capricious or fails to draw its essence from the collective bargaining contract because it exceeds the confines of interpreting and applying the contract." In *Amoco Oil Company v. Oil, Chemical and Atomic Workers International Union, Local 7–1, Inc.,* 548 F.2d 1288 (7th Cir.1977), this court stated that the scope of our review of an arbitrator's award, "is confined to the narrow questions of whether the award 'draws its essence from the collective bargaining agreement' and whether 'the arbitrator's words manifest an infidelity to this obligation.'" *Id.* at 1293–94 (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)). We further stated:

"An arbitrator's award does 'draw its essence from the collective bargaining agreement' so long as the interpretation can in some rational manner be derived from the agreement, 'viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and

the law of the shop, may a reviewing court disturb the award.'"

*Id.* at 1294 (quoting *Ludwig Honold Manufacturing Co. v. Fletcher,* 405 F.2d 1123, 1128 (3d Cir.1969)). *See also Milwaukee Typographical Union No. 23 v. Newspapers, Inc.,* 639 F.2d 386 (7th Cir.1981) (reversing district court and denying enforcement of an arbitration award); *F.W. Woolworth Co. v. Miscellaneous Warehousemen's Union, Local No. 781,* 629 F.2d 1204, 1214 (7th Cir.1980) (reversing district court and enforcing arbitration award). We note that courts have had difficulty applying the standard, enunciated in *Enterprise Wheel,* that an arbitration award must be enforced if it "draws its essence from the collective bargaining agreement." *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. at 1361. In *Ethyl Corporation v. United Steelworkers of America, AFL–CIO–CLC,* 768 F.2d 180 (7th Cir.1985), we stated:

"The problem with the expression 'draws its essence from the collective bargaining agreement,' is that it invites the kind of error that the district judge fell into in this case, of setting aside an arbitration award because the judge is not satisfied that the award has a basis in a particular provision of the contract.

Whenever an arbitrator misreads a contract, it is possible to say that his award fails to draw its essence from the contract; that the ground of the award is not the contract but the arbitrator's misreading. But so long as the award is based on the arbitrator's interpretation— unsound though it may be—of the contract, it draws its essence from the contract."

*Id.* at 184. *See also Super Tire Engineering Co. v. Teamsters Local Union No. 676,* 721 F.2d 121, 122–24 (3d Cir.1983) (court enforces award and gives deference to arbitrator despite the fact that the arbitrator's interpretation of the contract was questionable). We further stated in *Ethyl Corporation* that "[i]t is only when the arbitrator *must* have based his award on some body of thought, or feeling, or policy, or law that is outside the contract ... that the award can be said not to 'draw its essence from

the collective bargaining agreement.'" 768 F.2d at 185 (quoting *Enterprise Wheel & Car,* 363 U.S. at 597, 80 S.Ct. at 1361). *See also Jones Dairy Farm v. Local No. P–1236, United Food Workers,* 760 F.2d 173 (7th Cir.1984) (arbitrator's award enforced where arbitrator relied on material incorporated by reference into the agreement in rendering award); *Young Radiator Company v. International Union, U.A.W.,* 734 F.2d 321 (7th Cir.1985) (court refused to enforce arbitrator's award when the arbitrator failed to follow the clear requirements of the contract); *Randall v. Lodge No. 1076, International Association of Machinists and Aerospace Workers, AFL–CIO,* 648 F.2d 462 (7th Cir.1981) (court refused to enforce arbitrator's award when arbitrator referred to past understandings despite a contractual provision expressly stating that past understandings were not part of the contract). Recently, in *Hill v. Norfolk and Western Railway Company,* 814 F.2d 1192 (7th Cir. 1987), we emphasized the deference that we give to arbitration awards. We stated:

"As we have said too many times to want to repeat again, the question for decision by a federal court asked to set aside an arbitration award—whether the award is made under the Railway Labor Act, the Taft-Hartley Act, or the United States Arbitration Act—is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. If they did, their interpretation is conclusive. By making a contract with an arbitration clause the parties agree to be bound by the arbitrators' interpretation of the contract. A party can complain if the arbitrators don't interpret the contract—that is, if they disregard the contract and implement their own notions of what is reasonable or fair. A party can complain if the arbitrators' decision is infected by fraud or other corruption, or if it orders an illegal act. But a party will not be heard to complain merely because the arbitrators' interpretation is

a misinterpretation. Granted, the grosser the apparent misinterpretation, the likelier it is that the arbitrators weren't interpreting the contract at all. But once the court is satisfied that they were interpreting the contract, judicial review is at an end, provided there is no fraud or corruption and arbitrators haven't ordered anyone to do an illegal act."

*Id.* at 1194 (citations omitted).

█ In the present case, CNPA argues that we should set aside the arbitrator's award claiming that the arbitrator's award had no basis in the contract. According to the CNPA, the arbitrator exceeded the scope of his authority in rendering his decision, and therefore the arbitration award failed to draw its essence from the collective bargaining agreement. The CNPA argues that the arbitrator should not have used the past practice of the parties in utilizing the Union's call room in interpreting the contract since the Union "repudiated" the call room practice when it refused to supply the journeymen to the Tribune absent lifetime job guarantees. Thus, the CNPA maintains, the arbitrator was grossly mistaken when he looked to the practice of the parties over the preceding 40 years and stated that the parties to the contract intended that the call room would be the sole source of journeymen pressmen since that practice was no longer followed prior to the initiation of the arbitration proceedings. In other words, according to the CNPA, the arbitrator read a past practice into the contract which had been terminated by the time the arbitrator rendered his decision. While the CNPA's argument appears to be plausible, we cannot say that the arbitrator's award failed to draw its essence from the contract. The arbitrator was fully cognizant of the fact that the Union had refused to supply journeymen to the Tribune upon request and even noted that the Union failed to explain the contractual provision on which it based its refusal. However, the arbitrator pointed out that at no time did the CNPA submit the matter of the Union's refusal to supply journeymen for employment without lifetime job guarantees to arbitration. Moreover, the arbi-

trator stated that this issue was not before him since the CNPA failed to file a grievance concerning the Union's actions and that his function was to interpret the contract as of the date the parties entered into it.

In rendering this award, the arbitrator did nothing more than refer to the past practices of the parties to interpret the contract. The arbitrator made this clear in rendering the award. He stated:

"The first question which should be addressed is the Association's claim that the evidence concerning past practice is irrelevant because no provision of the agreement directly addresses the question presented and the provisions of Section 46 therefore preclude any consideration of such practice. The undersigned must disagree. There are numerous provisions of the agreement which make reference to the call room and the hiring of journeymen pressmen. Those provisions would be difficult, if not impossible to properly understand and apply in the absence of any evidence concerning their past operation and interpretation.

While Section 46 does state that 'this contract' and the other documents referred to constitute the 'entire agreement,' it does not state that no consideration may be given to such matters as bargaining history or past practice in the resolution of 'questions of differences concerning the operation or interpretation of the agreement' as provided in Section 35. In the absence of such an express prohibition, the undersigned believes that it would be an unwarranted limitation on the proper function of an arbitrator under a labor agreement to refuse to consider such evidence. Of course, this does not mean that the arbitrator is free to add to, subtract from, or modify the provisions of the agreement, which would be beyond the appropriate jurisdiction of the arbitrator and contrary to the express provisions of paragraph 37."

In *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960), the United States Supreme Court stated that "the question of interpretation of the collective bargaining agreement is a question for the arbitrator." The Court continued to state that "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.* In *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the Supreme Court stated:

"The labor arbitrator's source of law is not confined to the express provisions of the contract as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance because he cannot be similarly informed."

*Id.* at 581–82, 80 S.Ct. at 1352.

As the Court suggests in *Enterprise Wheel* and *Warrior & Gulf Navigation*, parties to collective bargaining agreements expect labor arbitrators to use their expertise and look to such sources as the law of

the shop and prior practices in interpreting contracts. Here the arbitrator demonstrated that he was aware of the limits of his authority when he stated that he was not "free to add to, subtract from, or modify the provisions of the agreement" since interpreting the contract in that manner would violate the clear dictates of the contract. The arbitrator noted that he only utilized the past practices of the parties to interpret provisions of the contract which would be ambiguous absent reference to the prior practice of the Tribune and the Union. We do not find the arbitrator's decision in the present case to be a "manifest disregard of the agreement, totally unsupported by principles of contract construction." *Amoco Oil Company v. Oil, Chemical and Atomic Workers International Union, Local 7-1, Inc.*, 548 F.2d 1288, 1294 (quoting *Ludwig Honold Manufacturing Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969)). The arbitrator in the case at bar did not base "his award on some body of thought, or feeling, or policy, or law that is outside the contract." *Ethyl Corporation v. United Steelworkers of America, AFL-CIO-CLC*, 768 F.2d 180 (7th Cir.1985). We agree with the district court and order enforcement of the arbitrator's award on this issue.

### III

■ The Union cross-appeals the district court's failure to award attorneys' fees against CNPA, maintaining that CNPA's filing of its complaint to set aside the arbitrator's award was not grounded in fact nor warranted by existing law as required under Federal Rule of Civil Procedure 11. In reviewing the decision of the district court not to award attorneys' fees, we must determine whether the district court abused its discretion in not awarding attorneys' fees. *See District No. 8, International Association of Machinists & Aerospace Workers, AFL-CIO v. Clearing, A Division of U.S. Industries, Inc.*, 807 F.2d 618, 621 (7th Cir.1986). "Under the 'abuse of discretion' standard of review, the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place, but

rather, whether any reasonable person could agree with the district court." *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir.1984) (emphasis in original). Thus, "if reasonable men could differ as to the propriety of the [district] court's award, no abuse of discretion has been shown." *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 796 (7th Cir.1980).

Rule 11 "requires that the district court undertake an objective inquiry into whether the party or his counsel 'should have known that his position is groundless.'" *District No. 8*, 807 F.2d at 622 (quoting *Coleman v. CIR*, 791 F.2d 68, 71 (7th Cir. 1986)). *See also Dreis & Krump Manufacturing Company v. International Association of Machinists and Aerospace Workers, District No. 8*, 802 F.2d 247, 255 (7th Cir.1986). In *Miller Brewing Co. v. Brewing Workers Local Union No. 9, AFL-CIO*, 739 F.2d 1159, 1167 (7th Cir. 1984), we stated that "normally when no statute authorizes the award of attorney's fees in a particular class of cases—and none does. with respect to suits under ... section 301 [the statute under which the present parties have proceeded] ... the prevailing party is entitled to attorney's fees only if his opponent's suit or defense was frivolous, which our cases define to mean brought in bad faith...."

CNPA argued before the district court, but not before this panel, that the arbitrator exceeded his authority and read the past practices of the parties (using the Union's call room) into the contract in the form of a contractual requirement in the face of an express contractual provision dictating that the entire agreement between the parties was embodied within the written contract. The district court held that the arbitrator merely used the parties' past practices to interpret the existing contract. In discussing its decision not to award the Union reasonable attorney's fees, the district court stated "the line to be drawn between arbitral amendment and arbitral construction of a contract is far from simple." *Chicago Newspaper Publishers' Association v. Chicago Web Print-*

*ing Pressmen's Union No. 7*, No. 85–C–3295, slip op. at 13 (N.D.Ill. July 25, 1985) [Available on WESTLAW, DCT database]. The court continued to state that "[w]hile the plaintiff's position does not entirely square with the deferential articulation of judicial review in cases of this sort, the applicable precedent in this circuit has sometimes taken a stricter view of the limits on the arbitrator's power." *Id.* (citing *Young Radiator Company v. International Union, U.A.W.*, 734 F.2d 321 (7th Cir.1985); *Randall v. Lodge No. 1076, International Association of Machinists and Aerospace Workers, AFL–CIO*, 648 F.2d 462 (7th Cir.1981); *Milwaukee Typographical Union No. 23 v. Newspapers, Inc.*, 639 F.2d 386 (7th Cir.1981)). In each of the cases cited by the district court, this court overturned arbitration awards since it was obvious that in each case the arbitrator in rendering the award departed from the literal requirements of the contract and failed to reconcile that departure with the ordinary principles of contract construction. While the arbitrator in this case never departed from the literal requirements of the collective bargaining agreement, the CNPA was able to make a colorable argument that the arbitrator elevated the past practices of the parties to the level of a contractual requirement when he interpreted the contract. While we may disagree with the CNPA's argument, we cannot say that the CNPA exhibited bad faith in making its argument. We agree with the finding of the district court as to the denial of an award of attorney's fees for the services rendered herein.

### IV

■ The Union also seeks attorneys' fees on appeal in this court. Rule 38 of the Federal Rules of Appellate Procedure states "[i]f a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee." In *Spiegel v. Continental Illinois National Bank*, 790 F.2d 638 (7th Cir.1986), we stated " 'An appeal is frivolous when the result is obvious or when the appellant's argument is wholly without merit.' " *Id.* at 650 (quoting *Indianapolis Colts v. Mayor and City Coun-*

*cil of Baltimore*, 775 F.2d 177, 184 (7th Cir.1985). *See also District No. 8, International Association of Machinist & Aerospace Workers, AFL–CIO v. Clearing, A Division of U.S. Industries, Inc.*, 807 F.2d 618, 623 n. 1 (7th Cir.1986); *International Union of Bricklayers & Allied Craftsmen Local Union No. 20, AFL–CIO v. Jaska*, 752 F.2d 1401, 1406 (9th Cir.1985).

Our discussion above makes clear that the result of this appeal was not obvious. This court has on occasion overturned arbitrator's awards. *See Young Radiator Company v. International Union, U.A.W.*, 734 F.2d 321 (7th Cir.1985). For example, in *Young Radiator,* we found that the arbitrator failed to follow the *clear* language of the contract when he ordered the reinstatement of an employee who admitted stealing from the company. Here, we noted above that the CNPA's argument that the arbitrator should have ignored the prior practice of the parties was at least plausible. However, in light of the limited scope of our review and the unique facts in this case, we refuse to hold that the arbitrator's award failed to draw its essence from the collective bargaining agreement. The CNPA's argument in this court was different than its argument in the district court and strikes at the validity of the award and does not merely attack the arbitrator's interpretation of the agreement. As noted above, the CNPA argues that no prior practices existed for the arbitrator to use in rendering the decision. While we disagree with CNPA's novel argument, we refuse to say that it is without merit. The arbitrator even admitted that the contract was capable of many interpretations. The fact CNPA incorrectly assumed that the arbitrator's interpretation "failed to draw its essence from the contract" does not support an award of attorney's fees in this instance.

### V

The decision of the district court is affirmed. The Union's request for attorneys' fees under Federal Rule of Appellate Procedure 38 is denied.