LOCAL 786, International Brotherhood of Teamsters, Plaintiff-Appellee and Cross-Appellant, v. GLENVIEW MATERIAL COMPANY, Defendant-Appellant and Cross-Appellee.

First District (2nd Division)   No. 1—89—1692

Opinion filed September 28, 1990.

Karl W. Grabemann and Timothy L. Moorehear, both of McDermott, Will & Emery, of Chicago, for appellant.

Anthony Pinelli, of Chicago, for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant-appellant Glenview Material Co., Inc. (Glenview), appeals from a decision of the circuit court upholding an arbitrator's ruling that it violated its collective bargaining agreement with Local 786, International Brotherhood of Teamsters (union), in laying off James Richardson. Plaintiff-appellee union also cross-appeals from the circuit court's affirmance of the ruling of another arbitrator that Glenview did not violate the same collective bargaining agreement by laying off Robert Mathe, also a Glenview employee, who was dismissed under similar circumstances. We affirm the circuit court's decision upholding both awards.

The record establishes that Glenview sells and distributes building materials and, prior to March 1984, owned and operated 18 or 19 trucks of various kinds. It is undisputed that Glenview was in severe financial difficulty and suffered substantial losses in its fiscal years of 1982 and 1983. As a result, in the spring of 1983, Glenview's president, Gregory Stys, proposed to the union that Glenview be permitted to operate under an owner-driver system, whereby its trucks would be sold to employees and third-parties, who would then do the company's deliveries. Although the parties never reached agreement on the proposal, on February 24, 1984, a new collective bargaining agreement between the union and Glenview was concluded for the period July 1, 1983, through June 30, 1986, which did contain a series of provisions "covering" owner-drivers "within the terms and conditions of this agreement, including union security, hours, wages, overtime, health and welfare and pension and working conditions." The agreement also reserved to Glenview "the right to control the manner, means and details of and by which such Owner-Driver performs his services."

Shortly thereafter, Stys began to sell the company's trucks, three of them for cash to third parties, and later two more to third parties on the installment plan, but the great majority were sold to its own employees, also on an installment basis. Glenview provided varying amounts of financial assistance to the employee purchasers, and agreed to pay a set amount as wages, operating expenses, insurance payments, and pension contributions. A document entitled "New Broker Guidelines" was prepared by Stys and given to all owner-drivers, which addressed such matters as seniority, vacations, and pension contributions. The record is not clear as to whether these guidelines were fully enforced, but it appears that they provided for lesser benefits

compared to those specified in the collective bargaining agreement, a practice specifically prohibited by the owner-driver provisions of the agreement. Further, owner-drivers were not restricted to haul exclusively for Glenview.

Robert Mathe was employed as a truck driver by Glenview from 1972 until May 11, 1984. On or shortly before that date, he was approached by Stys and told that if he did not purchase the truck which he was driving, he would be laid off. When he refused to do so, he was laid off. At that time, Mathe was the least senior driver. His truck was sold to a third party, who then became an owner-driver for Glenview. Another Glenview employee, Richard Huber, also refused to buy his truck from the company and was laid off in December 1984. The men who replaced the drivers who refused to buy their trucks, including Mathe, were adjudged not to be independent contractors in a previous arbitration.

James Richardson's case is similar to Mathe's. At the time he was laid off in May 1984, Richardson was the least senior Glenview employee, although he had worked in the plant for 13 or 14 years. Richardson was asked to purchase his assigned truck, but he was not told that he would be laid off if he did not agree with the proposal. Nevertheless, because he refused to purchase the truck he was laid off. Although the record is not clear on the precise dates, a new driver, Richard J. Kenyon, hired immediately after Richardson's dismissal drove Richardson's truck for a period of either two weeks, according to Glenview's owner's testimony, or eight months, according to Kenyon's testimony, before he was made and accepted an offer to become an owner-driver.

Grievances were filed by both employees, and their cases were referred for binding arbitration pursuant to the terms of the collective bargaining agreement when the parties could not resolve their differences. The union argued before arbitrator Albert A. Epstein that Mathe's layoff violated the bargaining agreement in that Mathe was laid off because of his failure to buy the truck from Glenview and not because there was insufficient work for him to perform; thus, Glenview disregarded the seniority provisions of the agreement by replacing Mathe with another employee to perform the same work he had been doing and paying his replacement less than he would have had to pay Mathe. The union further charged that Glenview's truck buy-back "scheme" amounted to a leasing device to evade the agreement and that it was motivated by antiunion animus. These arguments were rejected on the ground that Glenview had legitimate financial concerns, and that the "controlling factor in the instant dispute is that" the

owner-driver provisions of the agreement gave Glenview the right to "insist that all employees, including the Grievant, had to operate under the owner-driver system and if an employee desired not to avail himself of that opportunity he faced the elimination of his work." Arbitrator Epstein specifically stated that he found no basis for the contention that Glenview was attempting to avoid the terms of the agreement. "The fact that a previous arbitration award in which the owner-drivers were held to be employees of the company," Mr. Epstein stated, "relates only to the employment relationship between the parties [which] does not affect the company's right to operate under an owner-driver system." He thus concluded that Mathe's layoff was not in violation of the collective bargaining agreement.

A markedly different conclusion was reached by arbitrator Alex Elson, who conducted the arbitration regarding Richardson's layoff. After first rejecting the union's contentions that Glenview was attempting to evade the agreement through its use of the truck buyback plan and that the employer had violated a provision in the contract dealing with subcontracting, Mr. Elson held that "the undisputed facts establish a violation of the seniority provisions of the agreement. The company operated on the assumption, in no way supported by the collective agreement, that the purchase of a truck was a condition precedent to employment with the Company ***. Nor does it provide that a condition to continued employment for an employee is an agreement that they purchase a truck from the Company and become an owner-driver ***. It is true," Arbitrator Elson continued, "that [the agreement] gives the Company *** the right to engage 'owner-drivers'. Owner-Drivers have been used in the trucking industry for many years but within the context of agreements, such as the agreement in this case, which protect the seniority rights of employees who are not 'owner-drivers.' " Arbitrator Elson ordered Glenview to reinstate Richardson with back pay notwithstanding that Glenview had sold all of its trucks to owner-drivers, emphasizing that Glenview had violated both his seniority and recall rights, that there was nothing in the agreement "which gives to owner-drivers super-seniority over employees who are not owner-drivers," and that business necessity is not grounds for violating a collective bargaining agreement. While expressing his "sympathy" for Glenview's "plight," Mr. Elson stated that "that is beside the point. My arbitral authority is limited to the interpretation and application of the collective bargaining agreement of the parties. My duty requires me to be faithful to the agreement. That agreement makes no allowance for 'business necessity' as a credible defense for violation of the agreement when the

agreement is silent on the matter." Mr. Elson went on to distinguish Mathe's layoff by stressing that "the hiring [of Kenyon] belies the contention of the Company that there was no work for the grievant when he was laid off \*\*\*. In view of this circumstance which clearly distinguishes the case from that covered by the Epstein award, I refrain from otherwise discussing the rationale of the Epstein award."

The union sought to vacate Arbitrator Epstein's award in the circuit court, invoking the Labor Management Relations Act, 29 U.S.C. §185 (1978), and the United States Arbitration Act, 9 U.S.C §10 (1970) (Arbitration Act). Glenview moved for summary judgment and filed a counterclaim which it, too, based on the Labor Management Relations Act and the U.S. Arbitration Act, seeking to vacate Arbitrator Elson's award, which in turn prompted the union to move for summary judgment on Glenview's counterclaim. Analyzing the awards under the standards of the Arbitration Act (9 U.S.C. §10 (1970)), the trial judge determined that neither award could be vacated for exceeding the scope of the arbitrator's authority because the awards were based on a correct interpretation of the collective bargaining agreement. Mathe's dismissal was proper, the judge held, because the sale of his truck meant that there was no longer work available for him, but Richardson's seniority and recall rights were violated because his truck was used for a period of time by a new employee who did not immediately purchase the truck. Both summary judgment motions were denied, both awards were affirmed, and this appeal followed.

■ As a preliminary matter, we note that while Federal law controls in cases involving the interpretation and enforcement of collective bargaining agreements (*Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 85 L. Ed. 2d 206, 105 S. Ct. 1904; *Local 174 v. Lucas Flour Co.* (1962), 369 U.S. 95, 7 L. Ed. 2d 593, 82 S. Ct. 571; *Textile Workers Union of America v. Lincoln Mills* (1957), 353 U.S. 448, 1 L. Ed. 2d 972, 77 S. Ct. 912), there is some doubt as to whether the Arbitration Act applies in these cases. (See *Miller Brewing Co. v. Brewery Workers Local Union No. 9* (7th Cir. 1984), 739 F.2d 1159, 1162, *cert. denied* (1985), 469 U.S. 1160, 83 L. Ed. 2d 926, 105 S. Ct. 912; Ray, *Court Review of Labor Arbitration Awards Under the Federal Arbitration Act*, 32 Vill. L. Rev. 57 (1987).) However, the alternative standard for reviewing collective bargaining arbitration awards in suits based on section 301 of the Taft-Hartley Act (29 U.S.C. §185 (1978)) is identical in substance to that of the Arbitration Act. (*Ethyl Corp. v. United Steelworkers of America* (7th Cir. 1985), 768 F.2d 180, 184.) The trial court's reliance on and the parties' alternative in-

vocation of the Arbitration Act are therefore not relevant to the disposition of this appeal.

The seminal case regarding the judicial review of labor arbitration awards is *United Steelworkers of America v. Enterprise Wheel & Car Corp.* (1960), 363 U.S. 593, 4 L. Ed. 2d 1424, 80 S. Ct. 1358, which underscores the deference that arbitration awards are to be accorded when they are presented for judicial review:

> "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be [seriously] undermined if courts had the final say on the merits of the awards." (363 U.S. at 596, 4 L. Ed. 2d at 1427, 80 S. Ct. at 1360.)

Moreover, "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." (363 U.S. at 599, 4 L. Ed. 2d at 1429, 80 S. Ct. at 1362; accord *United Paperworkers International Union v. Misco, Inc.* (1987), 484 U.S. 29, 38, 98 L. Ed. 2d 286, 299, 108 S. Ct. 364, 371.) Still, the *Enterprise Wheel* court explained that this deference is not boundless:

> "Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." 363 U.S. at 597, 4 L. Ed. 2d at 1428, 80 S. Ct. at 1361.

The parties acknowledge the applicability of these principles, citing *American Federation of State, County & Municipal Employees v. State of Illinois* (1988), 124 Ill. 2d 246, 529 N.E.2d 534, which relied heavily on *Enterprise Wheel.* We also note that the trial judge correctly relied upon this decision in his opinion for the appropriate standard of review. However, any attempt to determine whether or not the award of either of the arbitrators in this case draws it essence from the collective bargaining contract would plunge the court into a sea turbulent with the merits of the underlying grievances. The sheer circumstance that each party here can rationally argue that the unfavorable award is not supported by the language of the collective bargaining agreement, while the favorable award is endowed with such

support, and that based on those arguments two well-regarded arbitrators have reached different results through different interpretations of the same collective bargaining agreement affords an excellent example as to why our courts should not regard the arbitration tribunal as merely another agency to which we apply the provisions of our administrative review law.

■ That arbitrators should differ in their conclusions predicated on the same or similar facts should present nothing singular or apocalyptic to judges. While Arbitrator Epstein gave the owner-operator provisions of the bargaining agreement a much broader reading than did Arbitrator Elson, we are not permitted under *Enterprise Wheel* to exalt one of these interpretations over the other. The finality of labor arbitration awards is supported by policy justifications which go beyond a simple consideration of the merits of the dispute. (Heinsz, *Judicial Review of Labor Arbitration Awards: The Enterprise Wheel Goes Around & Around*, 52 Mo. L. Rev. 243, 248-56 (1987).) While a labor arbitration award may in extreme circumstances be so irrational as to require vacation (*Chicago Newspaper Publishers' Association v. Chicago Web Printing Pressmen's Union No. 7* (7th Cir. 1987), 821 F.2d 390; see also St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at Enterprise Wheel & Its Progeny*, 75 Mich. L. Rev. 1137, 1148-49 (1977)), we do not find any of those circumstances in this case.

Although the trial judge correctly invoked the *Enterprise Wheel* standard in upholding the awards in this case, in reaching the actual merits of the controversy he went beyond the strictures laid down by the Supreme Court in *Enterprise Wheel*. This does not preclude us, however, from affirming the judgment of the trial court, for "[i]t is the judgment and not what else may have been said by the lower court that is on appeal to a court of review." *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

DiVITO, P.J., and HARTMAN, J., concur.